UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                    )
                                          )        Case No. 21-15685 JGR
PERKY JERKY, LLC.                         )
EIN:                                      )        Chapter 11
                                          )
    Debtor.                               )

## MOTION FOR AUTHORITY TO USE CASH COLLATERAL

The Debtor and Debtor in Possession, Perky Jerky, LLC ("Debtor" or "Perky Jerky"), by and through its attorneys, Wadsworth Garber Warner Conrardy, P.C., moves the Court pursuant to 11 U.S.C. § 363(c)(2) and Bankruptcy Rules 4001(b) and 9014 for entry of an order authorizing the Debtor's use of cash collateral, setting a final hearing on the use of cash collateral, and providing adequate protection to properly perfected secured creditors, and as grounds therefor states as follows:

### BACKGROUND

1.      The Debtor filed its Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code on November 15, 2021 (the "Petition Date").

2.      The Debtor continues in possession of its property and is operating and managing its business, as debtor-in-possession, pursuant to Bankruptcy Code §§ 1107 and 1108.

3.      The Debtor is a Delaware corporation, with its principal place of business in Colorado. The Debtor is a wholesaler of all natural meat jerky products and distributes to a variety of retailers including many grocery stores, drug stores, and other mass retailers. The Debtor also maintains an on-line sale presence. The Debtor's jerky products include turkey, beef and pork products.

4.      The Debtor's bankruptcy filing is caused by the economic conditions related to the COVID pandemic. Since the pandemic began, retailers limited orders of Perky Jerky products due to diminished foot traffic in retail stores. In addition, Perky Jerky's raw material and ingredient costs have increased sharply and supply chain issues have caused a diminished ability to supply jerky product at a profitable cost.

5.      The Debtor maintains two secured loans which liens arising therefrom could encumber the Debtor's "cash collateral" as the term is defined in Bankruptcy Code § 363. The two liens are generally described as follows:

a. The Debtor and Aegis Business Credit ("Aegis") entered into the certain Purchase Order/Factoring and Security Agreement dated April 24, 2020 (the "HIH Loan Agreement").  Aegis assigned the HIH Loan Agreement to Howard Investment Holdings, LLC ("HIH") pursuant to that certain Assignment and Consent Agreement dated December 11, 2020.  An original UCC-1 financing statement was filed with the Delaware Secretary of State on April 23, 2020.  On December 21, 2020, HIH filed a subsequent UCC-1 financing statement reflecting the assignment.  The HIH Loan Agreement provides HIH with a lien on substantially all of the assets of the Debtor. The amount due and owing under the HIH Loan Agreement is approximately $810,420.31.

b. The Debtor and Triple Peak, LLC ("Triple Peak") entered into the Junior Secured Promissory Note in principle amount of $400,000 and dated September 4, 2020 (the "Triple Peak Note").  The Triple Peak Note granted the Triple Peak a lien on substantially all of the assets of the Debtor.    As a part of the Triple Peak Note, Triple Peak agreed its indebtedness is subordinate to the HIH Loan Agreement. Triple Peak filed a UCC-1 financing statement with the Delaware Secretary of State on September 11, 2020.  The amount due and owing under the Triple Peak Note is approximately $260,000.

6.     Based on the foregoing, HIH and/or Triple Peak may have a secured lien position on the Debtor's funds and revenues that constitute cash collateral as the term is defined in the Bankruptcy Code.

7.     The Debtor and HIH have entered into an Interim Cash Collateral Agreement, a copy which is attached hereto as Exhibit A and a Final Cash Collateral Agreement, a copy which is attached hereto as Exhibit B.

8.     The pertinent terms of the Interim Cash Collateral Agreement are:

a. <u>Indebtedness</u>. The Debtor acknowledges that pursuant to the HIH Loan Agreement, the Debtor is indebted and liable to HIH in the amount of approximately $844,699.09 (the "Prepetition Debt").  The Debtor does not believe the Prepetition Debt is subject to subordination or recharacterization for any reason, and believes the liens and security interests granted to HIH are valid, duly authorized, perfected, enforceable, non-voidable, first-priority liens and security interests in the Debtor's assets as of the Petition Date (Paragraph 1).

b. <u>Authorization to Use Cash Collateral</u>. All of the Debtor's cash, including the cash and other items located in accounts constituting a portion of HIH's Prepetition Collateral, wherever located, whether as original collateral or cash proceeds of such HIH's Prepetition Collateral are included within the definition of the term "Cash Collateral".  Subject to the terms and conditions set forth in the Interim Cash Collateral Agreement, HIH hereby consents to

the Debtor's interim use of Cash Collateral in the ordinary course of the Debtor's business until the earlier to occur of (a) entry of an order allowing the use of Cash Collateral on a final basis, or (b) termination of this Agreement as set forth below (collectively, the "Interim Period"). The Debtor is authorized, pursuant to § 363 of the United States Bankruptcy Code and the terms and conditions of this Agreement, to receive and use Cash Collateral during the Interim Period under § 363 of the United States Bankruptcy Code, as set forth in the Budget attached as Exhibit "C", plus all U.S. Trustee quarterly fees as they come due. The Debtor agrees to limit its net cash flow variance on its Budget during this Interim Period to no more than ten (10%) percent per line item per month.  To the extent that HIH comes into possession of cash through the lock box it operates for the Debtor, such cash shall be turned over to the Debtor and such funds shall be deposited into the Debtor in Possession bank account up to the amount necessary to fully fund the Budget plus 10 %.  Notwithstanding anything to the contrary herein, no amount of Cash Collateral may be used by any Committee to investigate the validity, enforceability, or priority of the Debtor's obligations under the HIH Loan Agreement and related documents or of HIH's security interest in and liens on its pre-/post-petition collateral and Cash Collateral, or to investigate any potential claims or defenses against HIH.   (Paragraph 2)

c. <u>Adequate Protection</u>: The Debtor is proving adequate protection as set forth in paragraph 3 of the interim cash collateral agreement.

9.     The pertinent terms of the final Cash Collateral Agreement are:

a.     <u>Indebtedness</u>. The Debtor acknowledges that pursuant to the HIH Loan Agreement, the Debtor is indebted and liable to HIH, without defense, counterclaim, or offset of any king, in the amount of approximately $844,699.09 (the "Prepetition Debt").  The Prepetition Debt is not subject to subordination or recharacterization for any reason, and the liens and security interests granted to HIH pursuant to the HIH Loan Agreement are valid, duly authorized, perfected, enforceable, non-voidable, first-priority liens and security interests in the Debtor's assets as of the Petition Date (the "Prepetition Collateral").  The Debtor further acknowledges that the value of the Prepetition Collateral as of the Petition Date exceeds the amount of the Prepetition Debt, thus rendering HIH oversecured and entitled to post-petition interest, and reasonable fees and costs (including attorney fees and costs) in accordance with Section 506(b) of the Bankruptcy Code. The Prepetition Debt and related obligations constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code) and fully enforceable without claim, defense, counterclaim, recoupment, or offset of any kind.  For avoidance of doubt, no portion of the Prepetition Debt is subject to avoidance, recharacterization, setoff, recoupment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and the Debtor hereby affirmatively waives any such claim or defense. The Debtor does not have, and hereby forever waives, releases, and affirmatively agrees not to allege or otherwise pursue, any defenses, affirmative defenses, counterclaims, claims, causes of action, recoupments, setoffs, or other rights that it has or may have arising under the Bankruptcy Code, applicable nonbankruptcy law, or

otherwise against HIH, or any of its affiliates, predecessors, successors, assigns, agents, officers, directors, members, employees, attorneys, insurers and advisors, (i) to contest any "Defaults" or "Events of Default" under the Prepetition Loan Documents which were or could have been declared by HIH; (ii) to contest any provisions of the Prepetition Loan Documents; (iii) to contest the principal amount of the Debtor's indebtedness to HIH as of the Petition Date; (iv) to contest the conduct of HIH in connection with any provisions of the Prepetition Loan Documents and this Agreement or the above captioned case including, without limitation, negotiating and obtaining court approval of this Agreement and proceedings in connection with the interpretation, amendment, modification, enforcement or carrying out of the Prepetition Loan Documents and this Agreement; (v) against HIH or avoidance actions pursuant to §§ 544, 547, 548, 549, 550, 552, and 553 of the Bankruptcy Code; and (vi) to challenge that the security interests and liens granted to HIH under the Prepetition Loan Documents or pursuant to this Agreement and any order approving this Agreement are senior, valid, fully perfected, non-voidable, enforceable, first priority security interests and liens. The liens and security interests granted to HIH pursuant to and in connection with the Prepetition Loan Documents were on the Petition Date, and are (i) valid, binding, perfected, enforceable, first priority security interests in and liens on, without limitation, the Prepetition Collateral, including cash proceeds thereof, and Cash Collateral; and (ii) not subject to avoidance, recharacterization, setoff, recoupment or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law. (Paragraph 2)

b.   The Cash Collateral. HIH's security interests and liens have attached to all funds, personal property, and real property including the product, issues, rents, profits and other proceeds of the Prepetition Collateral and HIH's security interest and liens notwithstanding the commencement of the Chapter 11 Case, as of the Petition Date and thereafter attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral, including, without limitation, those consisting of (i) all of the Debtor's rents and accounts receivable, and all cash proceeds (including cash insurance proceeds thereof), products, accessions, rents and profits of or in respect of any and all of the foregoing, and (ii) all deposit accounts and securities accounts into which the cash proceeds of the accounts receivable and rents are deposited, in each case whether owned or in existence as of the Petition Date or thereafter acquired or arising (collectively, the "Cash Collateral"). All of the Debtor's cash, including the cash and other items located in accounts constituting a portion of HIH's Prepetition Collateral, wherever located, whether as original collateral or cash proceeds of such HIH's Prepetition Collateral are included within the definition of the term "Cash Collateral". (Paragraph 3)

c.   Use of Cash Collateral.   Subject to the terms and conditions set forth in the Agreement, the Debtor is, through and including the termination of this order (the "Final Order") following issuance of a Remedies Notice as set forth below, authorized to use Cash Collateral solely to pay ongoing operating expenses, as set forth in the Budget attached hereto as Exhibit C (the "Cash Collateral Budget"), plus all U.S. Trustee quarterly fees as they come due. The Debtor agrees to limit its net cash flow variance on its Budget to no more than ten (10%) percent per line item per month, without the prior written consent of HIH.1   To the extent that HIH comes into possession of cash through the lock box it operates

---

1 If the parties cannot agree, then the Debtor may file a motion on notice to approve a new Budget and use of cash

for the Debtor (the "Lock Box"), such cash shall be turned over to the Debtor and such funds shall be deposited into the Debtor in Possession bank account up to the amount necessary to fully fund the Budget plus 10 %.  The Debtor will continue to have the same access to the Lock Box postpetition as it had prepetition, namely, electronic visibility into account so it can see amounts coming into and leaving the Lock Box.  Notwithstanding anything to the contrary herein, no amount of Cash Collateral may be used by any Committee to investigate the validity, enforceability, or priority of the Debtor's obligations under the HIH Loan Agreement and related documents or of HIH's security interest in and liens on its pre-/post-petition collateral and Cash Collateral, or to investigate any potential claims or defenses against HIH.  (Paragraph 4)

d.  <u>Adequate Protection</u>: The Debtor is proving adequate protection as set forth in paragraph 5 of the final cash collateral agreement.

e.  <u>Limitations on Use of Cash Collateral</u>. Notwithstanding anything herein to the contrary, no Cash Collateral may be used to (i) object, contest or raise any defense to, the validity, authorization, perfection, priority, extent, or enforceability of the Prepetition Debt or the liens securing HIH's Prepetition Debt, or the liens granted to HIH by this Agreement, (ii) assert any claims or causes of action against HIH, or (iii) as long as the Debtor is authorized or able to continue to use Cash Collateral pursuant to the terms of this Agreement, attempt to obtain, without the consent of HIH, or over the objection of HIH, the Court's authorization to use Cash Collateral under terms other than those provided herein or the Court's authorization to grant any priming, senior or pari passu security interest in or lien on the Prepetition Collateral or the Cash Collateral. (Paragraph 7)

f.  <u>Parties in Interest Bound.</u>  The admissions contained in the final cash collateral agreement shall be binding on the Debtor under all circumstances and shall be binding upon all other parties in interest, including, without limitation, any Committee and any chapter 7 or chapter 11 trustee that may be appointed or elected on behalf of the estate of the Debtor, except to the extent that (i) a party in interest (other than the Debtor) has filed an adversary proceeding or contested matter challenging the extent, validity, perfection, enforceability or priority of the Prepetition Debt or the liens on the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against HIH or on behalf of the Debtor's estate, no later than the date that is forty-five (45) days after the appointment of the Committee of unsecured claimholders under section 1102 of the Bankruptcy Code, but in no event later than sixty (60) days after entry of an order approving this Agreement. If any such adversary proceeding or contested matter is timely commenced as of such date, the admissions contained in this Final Order shall nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent that such acknowledgments and agreements are expressly challenged in such adversary proceeding or contested matter. If no such adversary proceeding or contested matter is commenced as of such date, then (i) the Prepetition Debt shall constitute allowed secured claims, not subject to subordination and otherwise unavoidable, for all purposes in this Chapter 11 Case and any subsequent chapter 7 case, (ii) the liens securing the Prepetition Debt on the Prepetition Collateral shall be deemed legal, valid, binding, duly authorized, perfected, not subject to defense, counterclaim,

collateral, but this Agreement shall become null and void.

recharacterization, offset of any kind, subordination and otherwise unavoidable, and (iii) HIH and the Prepetition Debt and the liens on the Prepetition Collateral securing the Prepetition Debt shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor thereto. (Paragraph 14).

10.     Perky Jerky's total asset value as of the Petition Date is approximately $1,934,044.77. The Debtor's accounts receivable as of the Petition Date is approximately $624,126.33.   The Debtor's cash on hand and in bank accounts as of the Petition Date is approximately $245,297.70.

11.      The Debtor is replacing its inventory, accounts receivable and cash in the ordinary course of its operations and through collections.

12.     Accordingly, the secured interest of the HIH and Triple Peak in the Debtor's assets is adequately protected against the Debtor's ongoing use of cash.

13.     The Debtor intends on continuing operations through a sale process. The Debtor will also continue to ship product during the sale process.  This will allow the Debtor to generate receivables.  The Debtor will also continue to collect outstanding receivables during the sale process.

**RELIEF REQUESTED**

14.     The Debtor plans to continue operation of its business throughout the Chapter 11 case and propose a Plan of Liquidation through the liquidation of all of its assets.  The continued operation of the business and generation and collection of receivables and the sale of the business as a going concern will maximize the return to creditors.

15.     In order to pay necessary operating expenses, the Debtor must immediately use cash collateral in which Secured Creditors may have an interest.  The Debtor proposes to use cash collateral on an interim basis until such time as the Court schedules a final hearing on the use of cash collateral.  At the final hearing, the Debtor will seek relief to use cash collateral over six months pursuant to a budget which is attached hereto.  On an interim basis over the next 30 days and on a six month basis, the Debtor has prepared a budget setting forth its expected revenues and cash use.  A copy of the budget is attached hereto and incorporated herein as Exhibit C ("Budget").  The Debtor proposes to meet the Budget subject to the ability to deviate from the Budget by up to 10% per line item, per month plus payment of the U.S. Trustee quarterly fee.

16.     The Budget reflects a conservative analysis of the Debtor's income and expenses over the projected periods.

17. The majority of the Debtor's revenues and available cash are derived from the sale of its jerky products and collection of accounts receivable. Without the use of cash collateral, the Debtor will have insufficient funding for business operations through the sale process, shipping goods and collecting receivables. Therefore, the Debtor's use of cash collateral during the interim period is necessary to avoid immediate and irreparable harm to the estate. With the use of cash collateral, the Debtor will not be able to pay employees, shipping costs, and other costs associated with operating the business.

18. The Debtor will be replacing its inventory, accounts receivable, cash, and cash equivalents in the course of its daily operations and therefore the collateral base will remain stable and will improve over time. The Debtor's cash position is projected to be positive after meeting expenses over the budgeted period.

19. In order to provide adequate protection for the Debtor's use of cash collateral to HIH it seek approval of the interim Cash Collateral Agreement and then the final Cash Collateral Agreement.

20. With respect to Triple Peak, the Debtor proposes the following:

   a. The Debtor will provide a replacement lien on all post-petition accounts and accounts receivable to the extent that the use of the cash collateral results in a decrease in the value of the collateral pursuant to 11 U.S.C. § 361(2);

   b. The Debtor will maintain adequate insurance coverage on all personal property assets and adequately insure against any potential loss;

   c. The Debtor shall provide to those secured creditors who so request and have not entered their appearance in the case all periodic reports and information filed with the Bankruptcy Court, including debtor-in-possession reports;

   d. The Debtor will only expend cash collateral pursuant to the Budget subject to reasonable fluctuation by no more than 10% for each expense line item per month;

   e. The Debtor will pay all post-petition taxes; and

   f. The Debtor will retain in good repair all collateral in which Bank has an interest.

21.     Should the Debtor default in the provision of adequate protection, the Debtor's approved use of cash collateral will cease and the Secured Creditors will have the opportunity to obtain further relief from this Court.

22.     Approval of the Debtor's use of cash collateral in accordance with this Motion and pursuant to the Budget, Exhibit C, is, on an interim basis and a final basis, in the best interest of the Debtor, its creditors and the estate as it will allow the Debtor to maintain its ongoing business operations, allow the Debtor to generate revenue, and provide the Debtor with an opportunity to propose a meaningful Plan.

23.     The Debtor requests authority to extend the six month budgeted cash collateral use period on notice with opportunity for a hearing solely to Secured Creditors and the U.S. Trustee by providing such parties with new budgets for additional monthly periods.


**REQUEST FOR EMERGENCY HEARING ON INTERIM RELIEF**

24.     Without the immediate use of cash collateral, the Debtor will not be able to fund ongoing business operations.  The Debtor therefore respectfully requests that the Court set an emergency hearing for the consideration of the interim use of cash collateral and continue such hearing as may be needed to allow for extensions of interim use.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, a proposed form is filed herewith, authorizing the Debtor's use of cash collateral in accordance with this Motion, authorize the Debtor to provide adequate protection to any properly perfected secured party in the form of that set forth herein, and for such further and additional relief as to the Court may appear proper.


Dated: November 15, 2021                    Respectfully submitted,

                                            By:/s/ Aaron A. Garber
                                                Aaron A. Garber #36099
                                                **Wadsworth Garber Warner Conrardy, P.C.**
                                                2580 West Main Street, Suite 200
                                                Littleton, CO 80120
                                                Telephone: (303) 296-1999
                                                Telecopy: (303) 296-7600
                                                Email: agarber@wgwc-law.com

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 21- |
| PERKY JERKY, LLC. | ) | |
| EIN: 81-1743614 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## INTERIM CASH COLLATERAL AGREEMENT WITH
## HOWARD INVESTMENT HOLDINGS, LLC

The Debtor, Perky Jerky, LLC ("Debtor") and secured creditor Howard Investment Holdings, LLC ("HIH") by and through their undersigned representatives, enter into this interim Cash Collateral Agreement (the "Agreement"), subject to Bankruptcy Court approval based on the following:

### BACKGROUND

A.     The Debtor filed for relief under Chapter 11 of Title 11 of the Bankruptcy Code on November 15, 2021 (the "Petition Date") and remains a Debtor-in-Possession.

B.     The Debtor is a Colorado corporation that sells a variety of jerky products, including turkey, beef, pork jerky and stick products. The Debtor's products are sold online and at nationwide retailers, including Amazon, Whole Foods, Walmart, Kroger Publix and Grocery Outlet.

C.     The Debtor believes HIH holds a lien on its "Cash Collateral" as the term is defined in the Bankruptcy Code § 363 as described below.

D.     The Debtor and Aegis Business Credit ("Aegis") entered into the certain Purchase Order/Factoring and Security Agreement dated April 24, 2020 (the "HIH Loan Agreement"). Aegis assigned the HIH Loan Agreement to HIH pursuant to that certain Assignment and Consent Agreement dated December 11, 2020. An original UCC-1 financing statement was filed with the Delaware Secretary of State on April 23, 2020. On December 21, 2020, HIH filed a subsequent UCC-1 financing statement reflecting the assignment. The HIH Loan Agreement provides HIH with a blanket lien on substantially all of the assets of the Debtor. The amount due and owing under the HIH Loan Agreement is approximately $844,699.09.

E.     The Debtor requires the use of Cash Collateral to operate in the ordinary course of business through the liquidation of its assets and to maximize the return to creditors.

F.     HIH consents and agrees to the Debtor's use of Cash Collateral based upon the terms and conditions contained herein.

## AGREEMENT

NOW THEREFORE, the Debtor and HIH agree as follows:

1.     <u>Indebtedness</u>. The Debtor acknowledges that pursuant to the HIH Loan Agreement, the Debtor is indebted and liable to HIH in the amount of approximately $844,699.09 (the "Prepetition Debt"). The Debtor does not believe the Prepetition Debt is subject to subordination or recharacterization for any reason, and believes the liens and security interests granted to HIH are valid, duly authorized, perfected, enforceable, non-voidable, first-priority liens and security interests in the Debtor's assets as of the Petition Date (the "Prepetition Collateral").

2.     <u>Authorization to Use Cash Collateral</u>. All of the Debtor's cash, including the cash and other items located in accounts constituting a portion of HIH's Prepetition Collateral, wherever located, whether as original collateral or cash proceeds of such HIH's Prepetition Pollateral are included within the definition of the term "Cash Collateral". Subject to the terms and conditions set forth in this Agreement, HIH hereby consents to the Debtor's interim use of Cash Collateral in the ordinary course of the Debtor's business until the earlier to occur of (a) entry of an order allowing the use of Cash Collateral on a final basis, or (b) termination of this Agreement as set forth below (collectively, the "Interim Period"). The Debtor is authorized, pursuant to § 363 of the United States Bankruptcy Code and the terms and conditions of this Agreement, to receive and use Cash Collateral during the Interim Period under § 363 of the United States Bankruptcy Code, as set forth in the Budget attached hereto as Exhibit "1", plus all U.S. Trustee quarterly fees as they come due. The Debtor agrees to limit its net cash flow variance on its Budget during this Interim Period to no more than ten (10%) percent per line item per month. To the extent that HIH comes into possession of cash through the lock box it operates for the Debtor, such cash shall be turned over to the Debtor and such funds shall be deposited into the Debtor in Possession bank account up to the amount necessary to fully fund the Budget plus 10 %. Notwithstanding anything to the contrary herein, no amount of Cash Collateral may be used by any Committee to investigate the validity, enforceability, or priority of the Debtor's obligations under the HIH Loan Agreement and related documents or of HIH's security interest in and liens on its pre/post-petition collateral and Cash Collateral, or to investigate any potential claims or defenses against HIH.

3.     <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Agreement, the Debtor shall use Cash Collateral only for the reasonable and necessary expenses (including post-petition administrative expenses) incurred in the operation of the Debtor's business and liquidation of the Debtor's assets as specifically set forth in the Budget subject to the above variance.

4.     <u>Adequate Protection</u>.

    a.  As adequate protection of the interests of HIH, in compliance with §506(b) of the Bankruptcy Code, and in consideration of consent to the Debtor's continued use of Cash Collateral as set forth in this Agreement, HIH is hereby granted an additional and replacement lien (the "Post-Petition Lien") on each and all of the Debtor's post-petition assets as HIH had in the Debtor's Prepetition Collateral under the HIH Loan Agreement and related security documents as of the Petition Date (collectively, the "Post-Petition Collateral"), and any and all proceeds of such Post-Petition Collateral, with such Post-Petition Lien being a perfected security interest in and lien on the Post-Petition Collateral having the same extent, validity, and priority as HIH has in the

Prepetition Collateral on the Petition Date. Notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction, the security interests and liens granted HIH pursuant to this Agreement, and recognized herein, shall be deemed fully and effectively granted and automatically-perfected immediately upon entry of an order by the Bankruptcy Court approving this Agreement and HIH need not provide any further notice and need not take any further steps under any applicable federal, state, or local law, rule or regulation to create or perfect such security interests or liens. HIH is additionally entitled, pursuant to Bankruptcy Code sections 361 and 363(e), to adequate protection of its interest in its Prepetition Collateral, including the Cash Collateral, for any diminution in value of its interests in such Prepetition Collateral, including, without limitation, any such diminution resulting from the use by the Debtor of Cash Collateral and any other prepetition collateral and the imposition of the automatic stay pursuant to Bankruptcy Code section 362.

b.   Liens. As adequate protection for any diminution in value of the HIH's interests in its Prepetition Collateral from and after the Petition Date, effective upon the date of this Agreement and without the necessity of the execution by the Debtor of any mortgages, security agreements, pledge agreements, financing statements or otherwise, and the following replacement security interests and liens are hereby granted to HIH:

i.   a perfected first-priority senior security interest in and lien upon all Cash Collateral, whether existing on the Petition Date or thereafter acquired, including the proceeds thereof;

ii.   a perfected first-priority senior security interest in and lien upon HIH's Prepetition Collateral in existence on the Petition Date and, to the extent of any diminution in value, thereafter acquired; and

iii.   a perfected security interest in and lien upon all property of the Debtor, whether existing on the Petition Date or thereafter acquired.

c.   Additional Adequate Protection. As additional adequate protection for HIH: (i) the Debtor shall maintain with respect to HIH's Prepetition Collateral and Cash Collateral insurance of the type and in the amount as the Debtor maintained as of the Petition Date; and (ii) commencing 30 days after the Petition Date, monthly delivery of an updated 13 week cash flow budget and variance report.

5.   Reports. The monthly variance report to be provided by the Debtor shall set forth the actual expenses vs. projected expense for the prior week. The Debtor shall also provide to HIH's counsel each Monthly Operating Report promptly after the same is filed with the Bankruptcy Court via EMECF.

6.   Binding Effect. All terms and provisions of this Agreement, including but not limited to, the security interest and liens granted herein, and the priority established hereby, shall be binding on the Debtor and any subsequently appointed Trustee under either Chapter 7 or 11 of the Bankruptcy Code.

7.      <u>Delivery of Pleadings</u>. If requested by HIH, the Debtor agrees to deliver to HIH or its counsel in addition to items required by Bankruptcy Rule 2002 and Orders of the Bankruptcy Court, copies of all operating reports, Statement of Financial Affairs and Schedules and all other pleadings filed with the Bankruptcy Court by the Debtor via EMECF.

8.      <u>Prohibition of § 364(d) Liens</u>. The Debtor shall not create, permit, assume or suffer to exist any lien or security interest in favor of any person or entity other than HIH against the Cash Collateral which takes priority or equal position to the liens held by HIH pursuant to Bankruptcy Code § 364(d), except liens and security interests expressly consented to in advance, in writing, by HIH or as authorized by the Bankruptcy Court.

9.      <u>Default</u>.

      a.      Default under this Agreement shall include the following: (each, a "Default"):

        i.      Failure to timely pay any of the Adequate Protection Payments;

        ii.     Failure to deposit all cash receipts in the Debtor-in-Possession account, or as otherwise ordered by the Bankruptcy Court;

        iii.    Failure to comply with any other term or condition of this Agreement, including, but not limited to, the reporting of information provided under this Agreement;

        iv.     The conversion of the bankruptcy case to a case under Chapter 7;

        v.      The appointment of a Trustee in the bankruptcy case; and

        vi.     The failure of the Debtor to maintain insurance on the HIH Prepetition Collateral, as required by the underlying loan documents.

      b.      <u>Remedies</u>. If the Debtor fails to timely make any Adequate Protection Payment, or if any other Default occurs, which default shall constitute an "Event of Default", then the Debtor shall have three (3) business days after written notice thereof to the Debtor by HIH to cure such default and such notice shall also be filed with the Bankruptcy Court. Upon the occurrence of an Event of Default, HIH's consent to the use of Cash Collateral shall automatically terminate thirty (30) days after written notice of such default without further Court Order.

10.     <u>Survival</u>. Notwithstanding the expiration of the Debtor's right to use Cash Collateral hereunder, or any Default by the Debtor causing its earlier termination of the use of Cash Collateral, the rights, security interests, liens, priorities, and adequate protection provided to HIH pursuant to the terms of this Agreement shall, in any and all events, survive and continue in full force and effect.

11.     <u>Notices</u>. Any and all notices, pleadings or filings required to be provided under this Agreement shall be provided in writing by U.S. First Class Mail, electronic mail or overnight delivery service, as follows:

If to the Debtor:

Perky Jerky, LLC
c/o Brian Levin
4830 S. Syracuse St.
Suite 300
Denver, CO 80237
brian@perkyjerky.com

With a copy to:

Aaron A. Garber, Esq.
Wadsworth Garber Warner Conrardy, PC
2580 West Main Street, Suite 200
Littleton, CO 80120
agarber@wgwc-law.com


If to HIH:

Howard Investment Holdings, LLC
Attn: Kevin Howard
198 North Woodhill Lane
North Salt Lake, UT  84054
kevin10@kahlawoffice.com

With a copy to:

Joseph M.R. Covey, Esq.
Parr Brown Gee, PC
101 South 200 East
Suite 700
Salt Lake City, UT 84111
jcovey@parrbrown.com

      12.    <u>No Waiver</u>. The Debtor agrees that this Agreement is not intended nor shall it be construed to be a waiver or limitation in any way by HIH of any rights or remedies under the Bankruptcy Code or other applicable law which it has or may have, including, but not limited to, the right of HIH to request relief from the automatic stay under § 362 of the Bankruptcy Code.

      13.    <u>Insurance</u>. The Debtor shall maintain and keep in full force and effect all insurance required under the underlying HIH Loan Agreement and related security documents.

      14.    <u>Amendment</u>. This Agreement shall not be amended, modified or supplemented except by written agreement executed by the parties hereto.

15.     Counterpart. This Agreement may be executed by each party in identical counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute one Agreement, binding upon all parties.

16.     Further Agreements. This Agreement may be continued by filing additional budgets, provided proper notice to parties in interest with an opportunity to object, and filed with the Bankruptcy Court.

17.     Bankruptcy Court Approval. The Debtor shall file all Motions and Notices necessary for approval by the Bankruptcy Court of this Agreement pursuant to Bankruptcy Rule 4001.

DATED November 15, 2021.          PERKY JERKY, LLC


                                         By:/s/ Brian Levin
                                            Brian Levin, Managing Member



                                         WADSWORTH GARBER WARNER
                                         CONRARDY, PC


                                         By: /s/ Aaron Garber
                                         Aaron A. Garber, Reg. No. 36099
                                         2580 West Main Street, Suite 200
                                         Littleton, CO 80120
                                         Telephone: 303-296-1999
                                         agarber@wgwc-law.com
                                         Attorneys for Debtor



DATED November 15, 2021.          HOWARD INVESTMENT HOLDINGS, LLC


                                         By:/s/ Kevin Howard
                                            Kevin Howard, Managing Member

PARR BROWN GEE, PC


By:*/s/ Joseph Covey*
Joseph M.R. Covey, Esq.
101 South 200 East
Suite 700
Salt Lake City, UT 84111
jcovey@parrbrown.com
*Attorneys for HIH*

**EXHIBIT 1**

## Perky Jerky - Operating Budget (CASH)

| | Week 1 Cash In (Out) | Week 2 Cash In (Out) | Week 3 Cash In (Out) | Week 4 Cash In (Out) | Mth 2 Cash In (Out) | Mth 3 Cash In (Out) | Mth 4 Cash In (Out) | Mth 5 Cash In (Out) | Mth 6 Cash In (Out) |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance (lockbox and bank account) | $245,000 | $248,000 | $263,000 | $277,000 | $229,050 | $283,750 | $318,450 | $453,150 | $437,850 |
| Net Cash Received | 20,000 | 20,000 | 20,000 | 50,000 | 300,000 | 200,000 | 300,000 | 100,000 | 50,000 |
| Cost Of Sales | | | | | | | | | |
| Tolling and ingredient charges for new production | | | | ($35,000) | ($175,000) | ($100,000) | ($100,000) | ($50,000) | ($50,000) |
| Marketing Platform/Licensing Fees | ($12,000) | | | | ($5,000) | | | | |
| Sales Broker Commissions | ($3,000) | ($3,000) | ($3,000) | ($3,000) | ($12,000) | ($12,000) | ($12,000) | ($12,000) | ($12,000) |
| General & Administrative | | | | | | | | | |
| Bank Service Charges | | | | ($500) | ($350) | ($350) | ($350) | ($350) | ($350) |
| Compensation | | | | | | | | | |
| Essential Employee Wages w/tax | | | | ($33,500) | ($23,500) | ($23,500) | ($23,500) | ($23,500) | ($23,500) |
| Employer Health Insurance w dental | | | | ($4,000) | ($3,500) | ($3,500) | ($3,500) | ($3,500) | ($3,500) |
| Total - Compensation | | | | | | | | | |
| Computer and Internet Expenses | ($1,000) | ($1,000) | ($2,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| Temps & Contractors | | | | ($3,000) | ($3,000) | ($3,000) | ($3,000) | ($3,000) | ($3,000) |
| Insurance Expense | | | | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| Office Supplies | | | | ($500) | ($500) | ($500) | ($500) | ($500) | |
| Postage, Shipping, Delivery | | | | ($250) | ($250) | ($250) | ($250) | ($250) | |
| Business Consulting | ($1,000) | | ($1,000) | ($1,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| Accounting & Legal Fees | | ($1,000) | | ($2,000) | ($2,000) | ($2,000) | ($2,000) | ($2,000) | ($2,000) |
| Rent Expense | | | | ($4,200) | ($4,200) | ($4,200) | ($4,200) | ($4,200) | ($4,200) |
| Travel Expense | | | | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) |
| NET CASH FLOW | 3,000 | 15,000 | 14,000 | (47,950) | 54,700 | 34,700 | 134,700 | (15,300) | (65,300) |
| Ending Cash Balance | $248,000 | $263,000 | $277,000 | $229,050 | $283,750 | $318,450 | $453,150 | $437,850 | $372,550 |

EXHIBIT B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 21- |
| PERKY JERKY, LLC. | ) | |
| EIN: 81-1743614 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## FINAL CASH COLLATERAL AGREEMENT WITH
## HOWARD INVESTMENT HOLDINGS, LLC

The Debtor, Perky Jerky, LLC ("Debtor") and secured creditor Howard Investment Holdings, LLC ("HIH") by and through their undersigned representatives, enter into this Final Cash Collateral Agreement (the "Agreement"), subject to Bankruptcy Court approval based on the following:

## BACKGROUND

A.     The Debtor filed for relief under Chapter 11 of Title 11 of the Bankruptcy Code on November 15, 2021 (the "Petition Date") and remains a Debtor-in-Possession.

B.     The Debtor is a Delaware corporation, with its principal place of business in Colorado. The Debtor is a wholesaler of all natural meat jerky products and distributes to a variety of retailers including many grocery stores, drug stores, and other mass retailers. The Debtor also maintains an on-line sale presence. The Debtor's jerky products include turkey, beef and pork products.

C.     HIH holds a lien on the Debtor's "Cash Collateral" as the term is defined in the Bankruptcy Code § 363 as described below.

D.     The Debtor and Aegis Business Credit ("Aegis") entered into the certain Purchase Order/Factoring and Security Agreement dated April 24, 2020 (the "HIH Loan Agreement"). Aegis assigned the HIH Loan Agreement to HIH pursuant to that certain Assignment and Consent Agreement dated December 11, 2020. An original UCC-1 financing statement was filed with the Delaware Secretary of State on April 23, 2020. On December 21, 2020, HIH filed a subsequent UCC-1 financing statement reflecting the assignment. The HIH Loan Agreement provides HIH with a blanket lien on substantially all of the assets of the Debtor. The amount due and owing under the HIH Loan Agreement is approximately $844,699.09. A copy of the HIH Loan Agreement, the assignment and the UCC financing statements are attached hereto as Exhibit 1 ("Prepetition Loan Documents").

E.     HIH is fully secured by the perfected security interest it holds in substantially all of the assets of the Debtor. As a result of good faith negotiations in an attempt to resolve their issues and to provide HIH with adequate protection for its collateral, the parties have agreed to an order allowing the Debtor's final use of HIH's Cash Collateral form and after the Petition Date for the

Debtor to operate in the ordinary course of business through the liquidation of its assets and to maximize the return to creditors, as provided herein.

F.      HIH and the Debtor are party to that certain interim Cash Collateral Agreement with Howard Investment Holdings, LLC dated November __. 2021 [docket No. ___] (the "Interim Order"), pursuant to which the Debtor is authorized to use Cash Collateral, subject to the terms of the Interim Order.  The Debtor and HIH seek Court approval for this Final Order (defined below) which amends and restates the Interim Order in its entirety.

## AGREEMENT

NOW THEREFORE, the Debtor and HIH agree as follows:

1.      Incorporation.  The Background contained hereinabove are material provisions of this Agreement and are incorporated herein in their entirety by this reference.

2.      Indebtedness.

    a.      The Debtor acknowledges that pursuant to the HIH Loan Agreement, the Debtor is indebted and liable to HIH, without defense, counterclaim, or offset of any king, in the amount of approximately $844,699.09 (the "Prepetition Debt").  The Prepetition Debt is not subject to subordination or recharacterization for any reason, and the liens and security interests granted to HIH pursuant to the HIH Loan Agreement are valid, duly authorized, perfected, enforceable, non-voidable, first-priority liens and security interests in the Debtor's assets as of the Petition Date (the "Prepetition Collateral").  The Debtor further acknowledges that the value of the Prepetition Collateral as of the Petition Date exceeds the amount of the Prepetition Debt, thus rendering HIH oversecured and entitled to post-petition interest, and reasonable fees and costs (including attorney fees and costs) in accordance with Section 506(b) of the Bankruptcy Code.

    b.      The Prepetition Debt and related obligations constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code) and fully enforceable without claim, defense, counterclaim, recoupment, or offset of any kind.  For avoidance of doubt, no portion of the Prepetition Debt is subject to avoidance, recharacterization, setoff, recoupment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and the Debtor hereby affirmatively waives any such claim or defense.

    c.      The Debtor does not have, and hereby forever waives, releases, and affirmatively agrees not to allege or otherwise pursue, any defenses, affirmative defenses, counterclaims, claims, causes of action, recoupments, setoffs, or other rights that it has or may have arising under the Bankruptcy Code, applicable nonbankruptcy law, or otherwise against HIH, or any of its affiliates, predecessors, successors, assigns, agents, officers, directors, members, employees, attorneys, insurers and advisors, (i) to contest any "Defaults" or "Events of Default" under the Prepetition Loan Documents which were or could have been declared by HIH; (ii) to contest any provisions of the Prepetition Loan Documents; (iii) to contest the principal amount of the Debtor's indebtedness to HIH as of the Petition Date; (iv) to contest the conduct of HIH in connection with any provisions of the Prepetition Loan Documents and this Agreement or the above captioned case

including, without limitation, negotiating and obtaining court approval of this Agreement and proceedings in connection with the interpretation, amendment, modification, enforcement or carrying out of the Prepetition Loan Documents and this Agreement; (v) against HIH or avoidance actions pursuant to §§ 544, 547, 548, 549, 550, 552, and 553 of the Bankruptcy Code; and (vi) to challenge that the security interests and liens granted to HIH under the Prepetition Loan Documents or pursuant to this Agreement and any order approving this Agreement are senior, valid, fully perfected, non-voidable, enforceable, first priority security interests and liens.

        d.   The liens and security interests granted to HIH pursuant to and in connection with the Prepetition Loan Documents were on the Petition Date, and are (i) valid, binding, perfected, enforceable, first priority security interests in and liens on, without limitation, the Prepetition Collateral, including cash proceeds thereof, and Cash Collateral; and (ii) not subject to avoidance, recharacterization, setoff, recoupment or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

       3.   <u>The Cash Collateral</u>. HIH's security interests and liens have attached to all funds, personal property, and real property including the product, issues, rents, profits and other proceeds of the Prepetition Collateral and HIH's security interest and liens notwithstanding the commencement of the Chapter 11 Case, as of the Petition Date and thereafter attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral, including, without limitation, those consisting of (i) all of the Debtor's rents and accounts receivable, and all cash proceeds (including cash insurance proceeds thereof), products, accessions, rents and profits of or in respect of any and all of the foregoing, and (ii) all deposit accounts and securities accounts into which the cash proceeds of the accounts receivable and rents are deposited, in each case whether owned or in existence as of the Petition Date or thereafter acquired or arising (collectively, the "Cash Collateral"). All of the Debtor's cash, including the cash and other items located in accounts constituting a portion of HIH's Prepetition Collateral, wherever located, whether as original collateral or cash proceeds of such HIH's Prepetition Collateral are included within the definition of the term "Cash Collateral".

       4.   <u>Use of Cash Collateral</u>.  Subject to the terms and conditions set forth in this Agreement, the Debtor is, through and including the termination of this order (the "Final Order") following issuance of a Remedies Notice as set forth below, authorized to use Cash Collateral solely to pay ongoing operating expenses, as set forth in the Budget attached hereto as Exhibit 2 (the "Cash Collateral Budget"), plus all U.S. Trustee quarterly fees as they come due. The Debtor agrees to limit its net cash flow variance on its Budget to no more than ten (10%) percent per line item per month, without the prior written consent of HIH.[1]  To the extent that HIH comes into possession of cash through the lock box it operates for the Debtor (the "Lock Box"), such cash shall be turned over to the Debtor and such funds shall be deposited into the Debtor in Possession bank account up to the amount necessary to fully fund the Budget plus 10 %.  The Debtor will continue to have the same access to the Lock Box postpetition as it had prepetition, namely, electronic visibility into account so it can see amounts coming into and leaving the Lock Box.  Notwithstanding anything to the contrary herein, no amount of Cash Collateral may be used by any Committee to investigate the validity, enforceability, or priority of the Debtor's obligations under the HIH Loan Agreement and related documents or of HIH's security interest in and liens on its pre-/post-petition collateral and Cash Collateral, or to investigate any potential claims or defenses against HIH.

---

[1] If the parties cannot agree, then the Debtor may file a motion on notice to approve a new Budget and use of cash collateral, but this Agreement shall become null and void.

5.     <u>Adequate Protection</u>.

a.   As adequate protection of the interests of HIH, in compliance with §506(b) of the Bankruptcy Code, and in consideration of consent to the Debtor's continued use of Cash Collateral as set forth in this Agreement, HIH is hereby granted an additional and replacement lien (the "Post-Petition Lien") on each and all of the Debtor's post-petition assets as HIH had in the Debtor's Prepetition Collateral under the HIH Loan Agreement and related security documents as of the Petition Date (collectively, the "Post-Petition Collateral"), and any and all proceeds of such Post-Petition Collateral, with such Post-Petition Lien being a perfected security interest in and lien on the Post-Petition Collateral having the same extent, validity, and priority as HIH has in the Prepetition Collateral on the Petition Date. Notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction, the security interests and liens granted HIH pursuant to this Agreement, and recognized herein, shall be deemed fully and effectively granted and automatically-perfected immediately upon entry of an order by the Bankruptcy Court approving this Agreement and HIH need not provide any further notice and need not take any further steps under any applicable federal, state, or local law, rule or regulation to create or perfect such security interests or liens. HIH is additionally entitled, pursuant to Bankruptcy Code sections 361 and 363(e), to adequate protection of its interest in its Prepetition Collateral, including the Cash Collateral, for any diminution in value of its interests in such Prepetition Collateral, including, without limitation, any such diminution resulting from the use by the Debtor of Cash Collateral and any other prepetition collateral and the imposition of the automatic stay pursuant to Bankruptcy Code section 362. Further, the automatic stay provisions of § 362(a) of the Bankruptcy Code are hereby vacated and modified to permit (i) HIH to undertake and perform all acts and take all actions necessary to implement this Agreement and (ii) the Debtor to create, and HIH to perfect, any and all security interests, liens, and mortgages granted herein; provided, however, that HIH shall not be required to file or record Uniform Commercial Code financing statements, mortgages, notices of lien, or other instruments with any filing authority to perfect any lien, mortgage, or security interest granted by this Agreement or take any other action to perfect such liens, mortgages, and security interests. If, however, HIH shall, in its sole discretion, elect for any reason to file, record or serve any such financing statements or other documents with respect to such security interests and liens, the Debtor shall execute the same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time on the Petition Date. A certified copy of this Agreement and any order approving the same may, in the discretion of HIH, be filed with or recorded in the filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copies of this Agreement and order for filing and recording without the imposition of any stamp, intangibles, recording or similar tax in accordance with the provisions of § 1146 of the Bankruptcy Code.

b.   <u>Liens</u>. As adequate protection for any diminution in value of the HIH's interests in its Prepetition Collateral from and after the Petition Date, effective upon the date of this Agreement and without the necessity of the execution by the Debtor of any mortgages, security agreements, pledge agreements, financing statements or otherwise, the following replacement security interests and liens are hereby granted to HIH:

Case:21-15685-JGR   Doc#:8   Filed:11/15/21   Entered:11/15/21 14:49:32   Page24 of 66

i.   a perfected first-priority senior security interest in and lien upon all Cash Collateral, whether existing on the Petition Date or thereafter acquired, including the proceeds thereof;

ii.   a perfected first-priority senior security interest in and lien upon HIH's Prepetition Collateral in existence on the Petition Date and, to the extent of any diminution in value, thereafter acquired; and

iii.   a perfected security interest in and lien upon all property of the Debtor, whether existing on the Petition Date or thereafter acquired.

If HIH, in its sole discretion, chooses to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of such security interests and liens, the liens and security interests granted herein shall be deemed perfected at the time and on the date of entry of this Final Order. Upon request by HIH, the Debtor is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments (in each case without representation or warranty of any kind) as may be necessary to enable HIH to further perfect, preserve and enforce the security interests and liens granted to HIH by this Final Order.

c.   Section 507(b) Claim. HIH is hereby granted a superpriority claim in the Debtor's Chapter 11 case as provided for in Bankruptcy Code section 503(b) and/or 507(b) with priority over any and all other administrative expenses in the Debtor's chapter 11 case of any kind payable or allowed pursuant to any provision of the Bankruptcy Code, including, but not limited to Bankruptcy Code sections 105, 326, 328, 330, 365, 503(a) 503(b), 507(a), 507(b), 546, 726(d), 1113 and/or 1114.

d.   Adequate Protection Payments. HIH is fully secured by the perfected security interest it holds in the assets of the Debtor. Unless otherwise agreed by the Debtor and HIH, the Debtor shall not make any adequate protection payments to HIH because of its oversecured lien status.

e.   Additional Adequate Protection. As additional adequate protection for HIH: (i) the Debtor shall maintain with respect to HIH's Prepetition Collateral and Cash Collateral insurance of the type and in the amount as the Debtor maintained as of the Petition Date; and (ii) commencing 30 days after the Petition Date, monthly delivery of an updated 13 week cash flow budget and variance report.

6.   Reports. The monthly variance report to be provided by the Debtor shall set forth the actual expenses vs. projected expense for the prior month. The Debtor shall also provide to HIH's counsel each Monthly Operating Report promptly after the same is filed with the Bankruptcy Court via EMECF.

7.   Limitations on Use of Cash Collateral. Notwithstanding anything herein to the contrary, no Cash Collateral may be used to (i) object, contest or raise any defense to, the validity, authorization, perfection, priority, extent, or enforceability of the Prepetition Debt or the liens securing HIH's Prepetition Debt, or the liens granted to HIH by this Agreement, (ii) assert any claims or causes of action against HIH, or (iii) as long as the Debtor is authorized or able to continue to use Cash Collateral pursuant to the terms of this Agreement, attempt to obtain, without

Page 5 of 12

the consent of HIH, or over the objection of HIH, the Court's authorization to use Cash Collateral under terms other than those provided herein or the Court's authorization to grant any priming, senior or pari passu security interest in or lien on the Prepetition Collateral or the Cash Collateral

8.     Reservation of Rights of HIH. HIH reserves the right to request further or different adequate protection in the future or to seek stay relief, and the Debtor or any other party may contest any such request. Any adequate protection request shall be heard by the Court on seven (7) business days' notice or as soon thereafter as the Court's schedule permits. In addition, HIH reserves all rights and defenses, including, without limitation, with respect to any final order or final relief pertaining to the Cash Collateral and/or the Prepetition Collateral.

9.     Automatic Stay. The automatic stay extant under Bankruptcy Code section 362(a) shall be, and it hereby is, modified to the extent necessary to permit HIH to send the Remedies Notice (defined below) and exercise any rights and remedies hereunder as set forth herein.

10.     Binding Effect. All terms and provisions of this Agreement, including but not limited to, the security interest and liens granted herein, and the priority established hereby, shall be binding on the Debtor and any subsequently appointed Trustee under either Chapter 7 or 11 of the Bankruptcy Code.

11.     Delivery of Pleadings. If requested by HIH, the Debtor agrees to deliver to HIH or its counsel in addition to items required by Bankruptcy Rule 2002 and Orders of the Bankruptcy Court, copies of all operating reports, Statement of Financial Affairs and Schedules and all other pleadings filed with the Bankruptcy Court by the Debtor via EMECF.

12.     Prohibition of § 364(d) Liens. The Debtor shall not create, permit, assume or suffer to exist any lien or security interest in favor of any person or entity other than HIH against the Cash Collateral which takes priority or equal position to the liens held by HIH pursuant to Bankruptcy Code § 364(d), except liens and security interests expressly consented to in advance, in writing, by HIH or as authorized by the Bankruptcy Court.

13.     Default.

   a.     Each of the following shall constitute an "Event of Default" hereunder: (i) use of Cash Collateral other than as set forth herein; (ii) the Debtor or any other party applies to the Court for an order authorizing the use of Cash Collateral or that seeks approval of a priming, senior or pari passu security interest in or lien upon Cash Collateral or the Prepetition Collateral; (iii) the filing by the Debtor of any pleading seeking to challenge HIH's lien upon Cash Collateral or the Prepetition Collateral or otherwise asserting rights, claims or causes of action against HIH with respect to the Prepetition Debt; (iv) the breach by the Debtor of its obligations under this Agreement; (v) any stay, reversal, vacatur or rescission of this Agreement; (vi) the dismissal of, conversion of or appointment of a trustee or an examiner with expanded powers in the Debtor's chapter 11 case; (vii) the failure of sale of assets of the Debtor; and (viii) an order shall be entered reversing, amending, supplementing, staying for a period in excess of three (3) business days, vacating or otherwise modifying this Agreement without the consent of HIH.

   b.     Remedies.  Immediately upon the occurrence or existence of an Event of Default,

HIH shall be authorized to issue a notice (a "Remedies Notice") (which Remedies Notice may be delivered by electronic mail) thereof to the Debtor, its counsel, counsel to any Committee and the U.S. Trustee. Upon the receipt of a Remedies Notice, the Debtor shall have three (3) business days to remedy the Event of Default to HIH's satisfaction, if the Event of Default is not cured within three (3) days, Debtor's right to use Cash Collateral shall automatically terminate thirty (30) days after issuance of the Remedies Notice without further Court Order.

14.    Parties in Interest Bound.

a.    The admissions contained in this Agreement shall be binding on the Debtor under all circumstances and shall be binding upon all other parties in interest, including, without limitation, any Committee and any chapter 7 or chapter 11 trustee that may be appointed or elected on behalf of the estate of the Debtor, except to the extent that (i) a party in interest (other than the Debtor) has filed an adversary proceeding or contested matter challenging the extent, validity, perfection, enforceability or priority of the Prepetition Debt or the liens on the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against HIH or on behalf of the Debtor's estate, no later than the date that is forty-five (45) days after the appointment of the Committee of unsecured claimholders under section 1102 of the Bankruptcy Code, but in no event later than sixty (60) days after entry of an order approving this Agreement. If any such adversary proceeding or contested matter is timely commenced as of such date, the admissions contained in this Final Order shall nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent that such acknowledgments and agreements are expressly challenged in such adversary proceeding or contested matter.

b.    If no such adversary proceeding or contested matter is commenced as of such date, then (i) the Prepetition Debt shall constitute allowed secured claims, not subject to subordination and otherwise unavoidable, for all purposes in this Chapter 11 Case and any subsequent chapter 7 case, (ii) the liens securing the Prepetition Debt on the Prepetition Collateral shall be deemed legal, valid, binding, duly authorized, perfected, not subject to defense, counterclaim, recharacterization, offset of any kind, subordination and otherwise unavoidable, and (iii) HIH and the Prepetition Debt and the liens on the Prepetition Collateral securing the Prepetition Debt shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor thereto.

15.    Successors and Assigns. The provisions of this Final Order shall be binding upon HIH, the Debtor, and their respective successors and assigns (including any trustee hereinafter appointed or elected for the Debtor's estate) and inure to the benefit of HIH and the Debtor and (except with respect to any trustees hereinafter appointed or elected for the estate of the Debtor) their respective successors and assigns.

16.    Unenforceability. If the Court does not approve this Agreement for any reason, then this Agreement has no effect, and neither the Agreement nor any action or procedure taken, nor any statement made, in connection with the negotiation, preparation, formulation or seeking approval of this Agreement may be referred to by any entity in connection with any proceeding or action, whether in this case or elsewhere.

17.    <u>Consent and Mutual Agreement</u>. Whenever any action may be taken under this Agreement upon the prior written consent of HIH or the prior mutual written agreement of the "parties", the action may be taken without any further notice or action or order of the Bankruptcy Court.

18.    <u>Survival</u>. Any actions taken pursuant to this Agreement, including, but not limited to the Debtor's granting of the security interest in and lien on the Postpetition Collateral in favor of HIH and the Debtor's use of Cash Collateral, shall survive entry of any order that may be entered: (i) confirming any plan in this case; (ii) converting this case to a case under Chapter 7 of the Bankruptcy Code; (iii) dismissing this case; (iv) granting HIH relief from the automatic stay of § 362 of the Bankruptcy Code; or (v) appointing a trustee or an examiner. Unless otherwise ordered by the Bankruptcy Court, the security interests and liens on the Prepetition Collateral continue in full force and effect and maintain their priority until all the obligations owed under the terms of the Prepetition Loan Documents and this Agreement are paid in full. Nothing in this Agreement shall in any way prejudice or compromise any rights that HIH has against parties other than the Debtor and nothing herein shall constitute a waiver of any default under the Prepetition Loan Documents or otherwise result in a waiver of any rights against the Debtor or its property.

19.    <u>Notices</u>. Any and all notices, pleadings or filings required to be provided under this Agreement shall be provided in writing by U.S. First Class Mail, electronic mail or overnight delivery service, as follows:

If to the Debtor:

Perky Jerky, LLC
c/o Brian Levin
4830 S. Syracuse St.
Suite 300
Denver, CO 80237
brian@perkyjerky.com

With a copy to:

Aaron A. Garber, Esq.
Wadsworth Garber Warner Conrardy, PC
2580 West Main Street, Suite 200
Littleton, CO 80120
agarber@wgwc-law.com

If to HIH:

Howard Investment Holdings, LLC
Attn: Kevin Howard
198 North Woodhill Lane
North Salt Lake, UT  84054
kevin10@kahlawoffice.com

With a copy to:

Joseph M.R. Covey, Esq.
Parr Brown Gee, PC
101 South 200 East
Suite 700
Salt Lake City, UT 84111
jcovey@parrbrown.com

20.    Insurance. The Debtor shall maintain and keep in full force and effect all insurance required under the underlying HIH Loan Agreement and related security documents.

21.    Amendment. This Agreement shall not be amended, modified or supplemented except by written agreement executed by the parties hereto.

22.    Counterpart. This Agreement may be executed by each party in identical counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute one Agreement, binding upon all parties.

23.    Bankruptcy Court Approval. The Debtor shall file all Motions and Notices necessary for approval by the Bankruptcy Court of this Agreement pursuant to Bankruptcy Rule 4001.

24.    Reservation of Rights.

a.    Nothing contained in this Agreement or HIH's consent to the use of its Cash Collateral shall constitute a determination that HIH is not entitled to additional, different or further adequate protection for continued use of its Cash Collateral. This Agreement shall not constitute a concession, acknowledgment, admission or stipulation by HIH or a finding by the Court that HIH's interest in the Prepetition Collateral is "adequately protected" within the meaning of §§ 361, 362, and 363 of the Bankruptcy Code.

b.    Nothing in this Agreement shall be construed to limit HIH's right to apply to the Court at any time for modification of this Agreement, for different, further, or additional adequate protection, for termination of the use of its Cash Collateral, for relief from the automatic stay, or for any other relief. Nothing in this Agreement, including the Budget, shall construe or be construed as a consent, acknowledgment or agreement by HIH to the Debtor's calculations of the value of the Prepetition Collateral and nothing herein shall constitute a waiver or estoppel with respect to the right of HIH to dispute the validity or accuracy of any calculation or valuation by the Debtor with respect collateral values or adequate protection based thereon.

c.    Except as expressly provided for herein, nothing contained in this Agreement (including, without limitation, the authorization to use Cash Collateral) shall impair or modify any claims, rights, or defenses available in law or equity to HIH and all such claims, rights, or defenses are fully reserved.

25.   <u>Further Agreements</u>. This Agreement may be updated by filing additional budgets, provided proper notice to parties in interest with an opportunity to object, and filed with the Bankruptcy Court.

DATED November 15, 2021.            PERKY JERKY, LLC


By:*/s/ Brian Levin*_____
        Brian Levin, Managing Member


WADSWORTH GARBER WARNER
CONRARDY, PC


By: */s/ Aaron Garber*_____
Aaron A. Garber, Reg. No. 36099
2580 West Main Street, Suite 200
Littleton, CO 80120
Telephone: 303-296-1999
agarber@wgwc-law.com
*Attorneys for Debtor*


DATED November 15, 2021.            HOWARD INVESTMENT HOLDINGS, LLC


By:*/s/ Kevin Howard*_____
        Kevin Howard, Managing Member


PARR BROWN GEE, PC


By:*/s/ Joseph Covey*_____
Joseph M.R. Covey, Esq.
101 South 200 East
Suite 700
Salt Lake City, UT 84111
jcovey@parrbrown.com
*Attorneys for HIH*

**EXHIBIT 1**
**(Loan Documents)**



## PURCHASE ORDER / FACTORING AND SECURITY AGREEMENT

THIS PURCHASE ORDER/ FACTORING AND SECURITY AGREEMENT ("Agreement") is made as of April 24, 2020 by and between PERKY JERKY, LLC, a Delaware limited liability company("Seller"), Brian Levin ("Guarantor"), and Aegis Business Credit, LLC, a Florida limited liability company ("Purchaser").

1.  **Definitions**. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

1.1. **"Account Debtor"** – Seller's customer or entity from which an Invoice or Account is due.

1.2. **"Approved Invoice Amount"** - the amount of Seller's Invoice that is approved for payment by the Account Debtor.

1.3. **"Approved Purchase Order"** – the amount of Seller's Purchase Order for the purchase of goods to fulfill a purchase order from an Account Debtor of the Seller, that is confirmed by the Account Debtor and approved for payment by the Account Debtor, and has been approved by Purchaser for purchase and funding.

1.4. **"Closed Account"** – a Purchased Account that has been collected in full from the Account Debtor or otherwise satisfied by a charge to the Reserve Account or other means.

1.5. **"Closed Purchase Order"** - a Purchase Order where the goods have been accepted by the Account Debtor and the resulting Account has been collected in full from the Account Debtor.

1.6. **"Collateral"** - all now owned and hereafter acquired personal property and fixtures, and proceeds thereof, (including proceeds of proceeds) including without limitation Accounts, Chattel Paper, Goods, Inventory, Equipment, Instruments, including Promissory Notes, Investment Property and Securities, Documents, Purchase Orders, Deposit Accounts, Commercial Tort Claims, money, Letters of Credit and Letter of Credit Rights, Supporting Obligations, General Intangibles, including Payment Intangibles, and proceeds of the foregoing. Any capitalized terms not defined herein shall have the meanings ascribed to them in the UCC.

1.7. **"Collection Date"** – the date payments are received / deposited to Purchaser's Lockbox.

1.8. **"Collection Period"** – the number of days from the Purchase Date up to and including the Collection Date.

1.9. "Exposed Payments" – payments received by Purchaser from or for the account of an Insolvent Debtor that has become subject to a bankruptcy or other insolvency filing (an "Insolvency Filing"), to the extent such payments cleared the Account Debtor's deposit account within ninety days of the filing of said Insolvency Filing.

1.10. **"Face Amount"** – the face amount shown on the purchased Invoice or Purchase Order at the time of purchase.

1.11. "Factoring Fee" - the amount funded on Approved Invoices or Approved Purchase Orders as well as the advance under the Inventory Advances multiplied by the Factoring Fee Percentage or the Purchase Order Factoring Fee Percentage, as applicable.

1.12. **"Factoring Fee Percentage"** – 3.5% over the Prime Rate. Prime Rate shall mean the greater of (i) the Wall Street Journal Prime Rate (which is the Prime Rate published in the "Money Rates" section of the Wall Street Journal from time to time) or (ii) 4%. Any change in the Prime Rate will increase or decrease the Factoring Fee Percentage. Any change in said Prime Rate shall be effective at the beginning of any business day on which such change is announced. Factoring Fees will accrue on an actual/360 basis (on the actual number of days elapsed over a year of 360 days).

1.13. **"Purchase Order Factoring Fee Percentage"** – the Vendor Cost funded by Purchaser shall be subject to a fee equal to 2.00% for each 30 days that the Vendor Cost is outstanding.

1.14. **"Initial Reserve Percentage"** – 100% less the Purchase Price Percentage.

1.15. **"Invoice"** – the document that evidences or is intended to evidence an Account. Where the context so requires, references to an Invoice shall be deemed to refer to the Account to which it relates. Invoice may also relate to invoices for retainage amounts owed to Seller.

1.16. **"Invoice Purchase Price Percentage"** – 70% of amount of invoice.

Seller Initials _____ bel            Purchaser Initials _____

1.17. **"Initial Reserve"** – the Face Amount less the Purchase Price.

1.18. **"Late Charge"** – 1% for each 10-day period.

1.19. **"Late Payment Date"** – Any Purchased Account that remains unpaid 90 days after the invoice date.

1.20. **"Misdirected Payment Fee" -** the greater of $1,000.00 or fifteen percent (15%) of the amount of any payment of a Purchased Account that is received or otherwise collected by Seller and not delivered in kind to Purchaser within 5 business days following the date of receipt by Seller.

1.21. **"Missing Notation Fee"**-a fee equal to five percent (5.00%) of the face amount of each invoice on any invoice that is sent by Seller to an Account Debtor that does not contain the notice as required by Section 2.10 hereof.

1.22. **"Obligations"** - all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any Bankruptcy Case in which Seller is a Debtor including but not limited to any obligations arising from any other financial accommodations.  Obligations may include, but are not limited to, obligations owed to Purchaser through the purchase of Seller's account owed as an Account Debtor to another client of Purchaser.

1.23. **"Purchase Date"** - the date Purchaser wires the Purchase Price to Seller's account or to any entity for the benefit of the Seller.

1.24. **"Purchase Order"** – A valid purchase order from Seller to its Vendor to purchase goods ordered by Seller's Account Debtor that are scheduled to be shipped within the time period of this Agreement, and are such goods are to be shipped directly to the Account Debtor.

1.25. **"Purchase Order Price Percentage"** – Up to 100% of direct costs as approved by Purchaser at sole discretion.

1.26. **"Purchase Price"** – the (i) sum of the Face Amount less any retainages or other deductions as determined by the Purchaser (ii) multiplied by the appropriate Purchase Price Percentage.

1.27. **"Purchased Account"** – Accounts or Purchase Orders purchased in accordance with this Agreement.

1.28. **"Purchaser's Lockbox" -** the address (maintained by Purchaser's independent bank) to which all payments by Account Debtors and Seller shall be directed, as follows:

**Aegis Business Credit LLC**
**PO Box 628274**
**Orlando, FL 32862-8274**

**In the case of payments to be made via wire transfer or other electronic means, the payment shall be directed as follows:**

| | |
|---|---|
| Bank Name: | BB&T (now Truist) |
| Bank Routing Number/ABA: | 263191387 |
| Account Number: | 0000146123724 |
| Name on Account: | Aegis Business Credit, LLC |
| Bank Address: | 400 N. Tampa Street, Suite 2500, Tampa, FL 33602 |
| Bank Phone Number: | 813-314-5297 |

1.29. **"Reserve Account"** - a bookkeeping account on the books of Purchaser representing the unpaid portion of Seller's Bonus, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

1.30. **"Reserve Shortfall"** - the amount by which the Reserve Account is less than the difference between the Invoice Purchase Price Percentage and 100%.

1.31. **"Retainage Invoices"**- Invoices which include fees for retainage as provided for under Account Debtor contracts or orders.

1.32. **"Vendor"**-the party who is supplying the goods as described in a Purchase Order.

1.33. **"Vendor Cost"** – the cost of Seller's Vendor to fulfill a Purchase Order.

bel

Seller Initials _____   **Purchaser Initials _____**

2.  **Assignment and Sale**.

   2.1.   Seller shall sell to Purchaser as absolute owner, with full recourse, such of Seller's Accounts that are presented by Seller to Purchaser from time to time on a Schedule of Accounts (similar in form to Exhibit A).  In connection with each offer of accounts to Purchaser, Seller shall email to Purchaser copies of subject invoice(s) to the following email address: invoices@aegisbusinesscredit.com, and shall mail the originals of such invoices at the request of Purchaser.  All purchases are at the sole and absolute discretion of the Purchaser.

   2.2.   Seller shall sell to Purchaser as absolute owner, with full  recourse, such of Seller's Purchase Orders that are presented by Seller to Purchaser from time to time on a Schedule of Purchase Orders (similar in form to Exhibit A-2).  When submitting Purchase Orders for possible purchase by Purchaser, Seller shall forward to Purchaser the original and one copy of each such Purchase Order, and such other documents in a form satisfactory to Purchaser, such as corresponding Vendor invoices.  All information contained on Purchase Order shall be verified by Purchaser to ensure, to Purchaser's satisfaction, that the information contained in each respective Purchase Order is reasonable and feasible (in terms of manufacturing capability, price, and delivery date), which verification may include, without limitation, direct confirmation from the Account Debtor/ buyer and/or Vendor.  Under no circumstances will Purchaser be facilitating the purchase of inventory by Seller which is not immediately being sold by Seller under the terms of a Purchase Order.  Purchaser may arrange, if Purchaser has reasonable cause to believe that the quality of the goods is deficient, for an independent pre-shipment quality inspection of the goods before Seller ships them to the Account Debtor/ buyer.  Seller shall be responsible for all costs and expenses associated with such inspections.

   2.3.   The acceptance and the providing of the Purchase Price by Purchaser of a Purchase Order will result in the creation of accepted Purchase Orders.  In connection with Purchaser's approval process for all orders from domestic Vendors which require that Purchaser make a cash payment to the Vendor prior to the shipment of the goods which are the subject of the Purchase Order, Seller shall provide to Purchaser a letter agreement from each Vendor of the goods which will include an unconditional irrevocable agreement by the Vendor to ship the goods in accordance with the instructions of Purchaser, including, a date before which the goods must be shipped, and an agreement from the Vendor that they will ship the goods which are the subject of the Purchase Order regardless of who the end user is, and without any setoffs, counterclaims, or any other claim against Seller, and that the goods will only be shipped to the end user and not to the Seller.  In connection with Vendors who require letters of credit, the letter of credit will contain such terms as Purchaser or the issuing bank (the "Issuing Bank") may require from time to time.  Seller agrees that the Purchase Price may be paid by Purchaser arranging for the issuance of one or more letters of credit ("LC") for the benefit of the Seller.  The term of the LC shall not exceed 90 days. In connection with the issuance of any LC, the Seller shall be responsible for the payment of all costs and fees of the Issuing Bank in connection with the issuance, modification, payment and maintenance of each LC.

   2.4.   Seller shall maintain at its offices a written assignment of all accounts offered to Purchaser, together with a copy of all invoices relating to such accounts, and evidence of delivery of related goods or performance of the related services (and, if requested, the original purchase orders from the applicable customers), all in a form satisfactory to Purchaser, and to make available to Purchaser all such assignment, invoices and evidence at Purchasers request.  Seller's books and records shall at all times reflect that the Purchased Accounts have been purchased by and are owned by Purchaser, and are not owned by Seller.

   2.5.   Purchaser shall determine in its sole discretion those Accounts which it desires to purchase and shall have the right to establish eligibility limits on Account Debtors.  Among those Accounts which are not eligible for purchase hereunder are the following:

   2.6.   limits on Account Debtors.  Among those Accounts which are not eligible for purchase hereunder are the following:

      2.6.1.   Accounts greater than 90 days from invoice date (provided, that the Purchaser may consider extending the 90 days to 120 days, at its sole discretion, and if it does, it may provide notice to the Seller (the "Extended Days")).

      2.6.2.   Contra Accounts, foreign accounts, retainage accounts;

      2.6.3.   Accounts due from Account Debtors located outside of the United States, which are not covered by credit insurance payable to Purchaser and in form, amounts and with underwriters acceptable to Purchaser;

      2.6.4.   Accounts due from the United States or any of its agencies or departments unless the requirements of the Assignment of Claims Act are fully complied with in connection with such Accounts;

      2.6.5.   Accounts owed by an Account Debtor where 25% or more of the total amount owed is over 90 days from invoice date (Cross Aging);

      2.6.6.   Any Account not evidenced with written acknowledgement from the Account Debtor;

      2.6.7.   Any Account due from an affiliate or party in any way related to the Seller; and

      2.6.8.   Any portion of an invoice which has been paid as a Deposit.

**Seller Initials** _____        **Purchaser Initials** _____

2.7.   Seller shall submit Invoices to offer for sale to Purchaser in accordance with this Agreement. Purchaser shall then review Invoices and related information to decide whether any of such Invoices and Accounts shall be purchased. Purchaser may accept or reject any Invoice at its sole and absolute discretion. Nothing in this Agreement obligates Purchaser to purchase any particular Invoice. The parties herein agree that, without the prior written consent of Purchaser, the maximum amount that may be funded hereunder shall at not exceed the lesser of (A) (i) 70% of the Face Amount of Accounts purchased by Purchaser, plus (ii) the Maximum PO Amount, as defined below, plus (iii) the total amount of outstanding Inventory Advances, as defined below, (B) or Two Million and 00/100 Dollars ($2,000,000.00) (the "Maximum Amount").

2.8.   At its election from time to time during the term of this Agreement, Seller agrees to offer for sale to Purchaser certain of its Purchase Orders on terms set forth in this Agreement. Purchaser may, in its sole and absolute discretion, may agree to advance rates for Purchase Orders that are different from the advance rate stated above for initial Purchase Orders from certain customers and Vendors. Purchaser may decline to purchase any Purchase Orders presented in its sole and absolute discretion. The parties herein agree that, without the prior written consent of Purchaser, the maximum Face Amount of Purchase Orders Accounts that Purchaser may purchase hereunder anytime, together with Face Amounts of Purchase Orders previously purchased by Purchaser from Seller shall hereunder which then remain outstanding, will not exceed Three Hundred Fifty Thousand and 00/100 dollars ($350,000.00) ("Maximum PO Amount").

2.9.   Upon on the Seller's written request, the Purchaser may, from time to time, in its sole discretion, subject to the terms and conditions of this Agreement, and in addition to other advances being made to the Seller hereunder, make advances to Seller prior to its sale of Inventory (the "Inventory Advances"), in an amount up to the lesser of (i) 50% of the actual cost of the Inventory which Purchaser may deem eligible in Purchaser's sole discretion, (ii) 60% of the net outstanding amount of Accounts eligible for purchase under this Agreement (as determined by Purchaser), and (iii) $500,000.00, and such reserves as Purchaser shall establish from time to time in Purchaser's discretion. In no event shall the total of the outstanding Inventory Advances exceed $500,000.00, and Seller shall immediately pay to Purchaser any and all amounts necessary to reduce the aggregate outstanding Inventory Advances below such limits. Borrowed amounts that are repaid may be reborrowed upon the terms and conditions of this Agreement. Any such Inventory Advances will be made at Purchaser's sole discretion, will be charged by Purchaser to Seller and will bear interest payable in the manner and at the Factoring Fee Percentage, unless such Inventory Advance is evidenced by a note or an instrument of indebtedness, in which event the terms thereof shall be controlling. All such Inventory Advances shall be payable by Seller on demand (unless otherwise provided in a note or instrument of indebtedness) and recourse to the security therefor will not be required at any time. All Inventory shall be located in locations where the owner of such location shall have entered into a landlord's or warehousemen's waiver in favor of Purchaser, in form acceptable to Purchaser, and all Inventory shall be insured with such underwriters and in such amounts as required by Purchaser, and shall name Purchaser as "Lender Loss Payee." The amount of all such loans and advances and the relation thereof to the value of the Inventory will be determined by Purchaser alone, in Purchaser's sole discretion. All Inventory Advances shall be subject to the Invoice Factoring Fee Percentage until repaid in full. Only Inventory that is raw materials and finished goods are eligible for Inventory Advances.

Except for sales made in the regular course of Seller's business, Seller shall not sell, encumber or dispose of or permit the sale, encumbrance or disposal of any Inventory without Purchaser's prior written consent. As sales are made in the regular course of business, Seller shall, in accordance with the provisions of this Agreement, immediately execute and deliver to Purchaser schedules and assignments of all Accounts created by Seller. Any collateral assigned to Purchaser under this Agreement shall be additional security for the payment of all sums owing by Seller to Purchaser for advances pursuant to this Agreement. If sales are made for cash, Seller shall immediately deliver to Purchaser the identical checks, cash or other forms of payment which Seller receives. All payments received by Purchaser on account of cash sales of Inventory, as well as on account of Account, will be credited to Seller's account in accordance with the provisions of this Agreement.

If any Inventory remains in the possession or control of any of Seller's agents or processors, Seller shall notify such agents or processors of Purchaser's lien, and upon request shall instruct them to hold all such Inventory for Purchaser's account and subject to Purchaser's instructions. Seller agrees to maintain books and records pertaining to the Inventory in such detail, form and scope as Purchaser shall require, and Seller agrees to notify Purchaser promptly of any change in Seller's name, mailing address, principal place of business or location of the Inventory. Seller will also advise Purchaser promptly, in sufficient detail, of any substantial change relating to the type, quantity or quality of the Inventory, or any event which would have a material effect on the value of the Inventory or on the lien and security interest granted to Purchaser herein. A physical listing of all Inventory, wherever located, shall be taken by Seller whenever requested by Purchaser, and a copy of each such physical listing shall be supplied to Purchaser. Purchaser may examine and inspect the Inventory at any time. Seller will execute and deliver to Purchaser from time to time, upon demand, such supplemental agreements or documents relating to Inventory, or instruments of indebtedness, in order that the full intent and purpose of this Agreement may be carried into effect.

2.10.   Purchaser shall use its best efforts to pay the Purchase Price, less any amounts or Obligations due to Purchaser from Seller within two (2) business days of verifying the value and eligibility of the Invoice based on Purchaser's internal policies and procedures, whereupon the Accounts shall be deemed Purchased Accounts. In order for an account to be eligible for purchase by Purchaser, the related invoice must set forth, as sole address for payment, the Purchaser's Lockbox address.

2.11.   Payments by Purchaser. Seller authorizes Purchaser to make any payments via wire transfer or electronic means to the following:

Bank Name: _____

Bank Routing Number/ABA: _____

Page 4 of 22                          Seller Initials _bel___                    Purchaser Initials _____

Account Number: _____

Name on Account: _____

Bank Address: _____

2.12. Purchaser may withhold or offset any Obligation from the Purchase Price of any Invoice, and may establish such reserves as it determines in its sole discretion from time to time.

2.13. All Account Debtors will be instructed to make payment to Purchaser by a notification letter (similar in form to Exhibit B)

2.14. Account Debtors or Seller's vendors identified by Purchaser, at Purchaser's sole discretion, will be required to sign a verification letter (similar in form to Exhibit C and Exhibit C-1), as set forth by Purchaser's internal policies and procedures.

2.15. All of the Seller's Invoices shall contain Purchaser's PO Box address listed as sole payment address.

2.16. All of the Seller's Invoices shall contain language on their face indicating that the invoices have been assigned to and are payable only to Purchaser, the exact language to be approved by the Purchaser in advance.

2.17. The maximum amount to be funded and outstanding at any time hereunder under the Maximum Amount, the Maximum PO Amount and the Inventory Advances shall not at any time exceed $2,000,000.00 (the "Maximum Total Amount").

3. **Payments by Account Debtors**

3.1. All collections of Purchased Accounts shall be applied as a payment of each such Purchased Account provided that Purchaser may, at its option, apply any collections to any other Obligations.

3.2. All payments shall be applied after the third (3) business day for clearance (such period is being referred to a "Clearance") after receipt and processing by Purchaser.

3.3. Seller shall make continuing collection efforts for all Accounts in the ordinary course of business, provided that collections of all Purchased Accounts shall be conducted only as directed by Purchaser.

3.4. Collections by Purchaser of Accounts which are not Purchased Accounts shall be applied by Purchaser to the Obligations in the manner determined by Purchaser in its sole discretion.

3.5. If Seller receives any cash, notes, checks, drafts, acceptances, or collections in any form on any Accounts assigned to Purchaser, Seller shall hold those amounts in trust for Purchaser (separate and apart from Seller's own funds), and Seller shall immediately transmit and deliver them to Purchaser in the identical form received. Seller's failure to immediately deliver those payments to Purchaser gives Purchaser the right to demand cash payment from Seller, to immediately terminate this Agreement and to collect those funds by withholding amounts otherwise due to or held for Seller by Purchaser without demand or notice, or both, among other remedies, as well as the right to charge the Misdirected Payment Fee. Purchaser (and each person that Purchaser may from time to time designate) has the absolute right and power of attorney to act on Seller's behalf and have the right to sign and/or endorse Seller's name on any and all checks, drafts, and remittances of any kind or nature where the endorsement may be required to effect collection, and to sign and/or endorse papers, receipts, documents, instruments, and bills of lading relating to transactions between Seller and Purchaser. If, for any reason, Seller receives a draft, check, or payment from any Account Debtor in payment on an Account conveyed to Purchaser and Seller does not immediately endorse and deliver the draft, check, or payment to Purchaser (whether Seller uses those funds, deposits the draft, check, or payment to Seller's own account, turns those funds over to another person, or otherwise), Seller acknowledge that Seller is liable for fraud and is guilty of theft and conversion of Purchaser's property.

4. **Reserve Account**.

4.1. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

4.2. Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser.

4.3. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account.

4.4. Purchaser, in its sole discretion, may pay to Seller the Seller's Bonus, if any, from the available Reserve Account every Friday.

4.5. Upon termination of this Agreement, Purchaser may retain the Reserve Account for ninety days to be applied to any Obligations that were unknown to Purchaser at time of termination.

4.6. Upon the occurrence of an Event of Default, Purchaser may, in its sole discretion, suspend payments to Seller from the Reserve Account until the Event of Default has been resolved to Purchaser's satisfaction.

bel

Seller Initials _____          Purchaser Initials _____

5. **Fees and Expenses**.  Fees noted below (i) shall not be subject to rebate, refund or proration, except as otherwise set forth herein or required by applicable law, (ii) are and shall be deemed to be for compensation for services, and (iii) are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.  Seller shall pay to Purchaser the following fees when earned :

   5.1.  The Factoring Fee that is earned each day.  The Factoring Fee shall be payable monthly for the prior month on or around the 10th day of each month, as determined by the Purchaser in its sole discretion.

   5.2.  A wire transfer fee of $25 that is earned upon each wire transfer.

   5.3.  Annual Facility Fee:  An annual facility equal to $5,000.00  shall be due at closing and on each annual anniversary of the Agreement.

   5.4.  Collateral Management Fee:  A monthly collateral management fee equal to 0.60% of the average funds outstanding shall be assessed each month.  The Collateral Management Fee shall be payable monthly for the prior month on or around the 10th of each month.

   5.5.  Bankruptcy/Insolvency Fee:  In the event that any Account Debtor files an insolvency proceeding, any amounts recovered by Purchaser after the filing of the insolvency proceeding will be subject to a bankruptcy/insolvency fee equal to fifty percent (50%) of the amounts recovered or collected, and the balance of the amounts recovered or collected shall be used to reduce the Obligations.  In addition, all of the Accounts owing from such Account Debtor shall be subject to repurchase by the Seller as more particularly set forth herein.

   5.6.  The Missing Notation Fee is due and earned upon its accrual.

   5.7.  Early Termination Fee:  In the event that the Seller seeks to terminate this Agreement and repay all amounts owing hereunder within the first year of the term of this Agreement as a result of a sale of a material portion of the assets or equity of the Seller, in addition to all other amounts due hereunder, the Seller shall pay the Purchaser an early termination fee in the amount of $45,000.00.

   5.8.  Out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as UCC searches and filings, background searches, credit checks, and audit fees which are earned and due upon their occurrence.

   5.9.  Seller shall pay to Purchaser a documentation fee equal to $500.00 upon closing and future renewals of this agreement.

   5.10.  If Seller submits an Invoices with incorrect information that may delay Account Debtor's approval or payment, Seller may incur a fee of $100 per invoice affected, at Purchaser's sole discretion.

   5.11.  If at any time during the life of this Agreement a Reserve Shortfall occurs, then Seller may be required to pay a waiver fee equal to $500 to Purchaser, if Purchaser elects, in its sole discretion, to issue a waiver.  The waiver will be for a maximum period of 30 days.

   5.12.  If Seller's Account Debtors take any discounts or charge backs of any dollar amount that were not contained or offered on the original invoice purchased, then Seller may be required to pay an adjustment fee of $100 to Purchaser.

   5.13.  Purchaser, in its discretion upon written notice to Seller, may charge a rush request fee in the amount of $500.00 per request, in the event that Purchaser agrees, at Seller's request, to complete a funding request sooner than the timeframes outlined in this Agreement.

6. **Servicing**:  Purchaser hereby appoints Seller as servicing agent for Purchaser ("Servicer") for the purpose of expediting payment of Accounts purchased by Purchaser hereunder which become past due.  Servicer agrees to maintain an active, on-going and regular dialogue with each Account Debtor.  Servicer further agrees to utilize all influences and rights and take every action within its control in accordance with the law to expedite the collection of the Accounts purchased by Purchaser which become past due and direct such payment to the authorized address herein. Seller will furnish to Purchaser, upon request, all papers, documents and records in its possession related to Accounts purchased by Purchaser and agrees to fully cooperate with Purchaser in all matters relating to collection of Accounts purchased by Purchaser hereunder.  Purchaser reserves the right to terminate this servicing relationship at any time without cause or without notice to Servicer.  Nothing provided herein shall affect Purchaser's right to contact Account Debtors or otherwise be involved in the collection and verification of the Accounts.

7. **Repurchase of Accounts**.  Purchaser may require that Seller repurchase, by payment of the then unpaid Face Amount less the applicable balance of Reserve Account:

   7.1.  If an Invoice remains unpaid for more than 90 days (or the Extended Days, in the event that the Purchaser has provided notice to the Seller that the Extended Days will be in effect), Seller will have the option of one of the following: (i) Repurchase the subject Invoice for the original funded amount plus fees incurred to date; (ii) Present a substitute open and eligible invoice to Purchaser; (iii) Elect to have the subject Invoice settled against Seller's Reserve Account.

   7.2.  Any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute; any Purchased Account which remains unpaid past the Late Payment Date shall by default be considered a disputed account; and

Page 6 of 22                                            Seller Initials _____   bel   Purchaser Initials _____

7.3. Any Purchased Account, where the Seller has breach any of the representations, warranties or covenants regarding such Purchased Account; and

7.4. All Purchased Accounts upon the occurrence of an Event of Default.

Any repurchased Accounts shall remain subject to the security interest in favor of Purchaser.

8. **Repurchase of Factored Purchase Orders:** Purchaser shall be entitled to immediate and full recourse against and repayment by Seller and to demand payment with respect to Accepted Purchase Orders for the full Purchase Price, if one of the following events occurs:

8.1. An accepted Purchase Order is not fulfilled to a customer within the time frame specified on the Purchase Order;

8.2. A dispute with Seller's customer associated with accepted Purchase Order;

8.3. A dispute with Seller's Vendor associated with accepted Purchase Order; or

8.4. An incorrect, mistaken and /or erroneous Purchase Order is submitted by Seller to Purchaser.

9. **Security Interest.** As collateral securing all of its obligations to Purchaser, now existing and hereafter arising, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral. Notwithstanding the creation of this security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower. This Agreement shall constitute a security agreement pursuant to the Uniform Commercial Code in effect in the State of Florida (the "UCC"), and in addition to any and all of Purchaser's other rights under this Agreement, Purchaser will have all of the rights of a secured party pursuant to the provisions of the UCC. In addition to Purchaser's other rights hereunder and as additional collateral security to Purchaser for any and all of Seller's Obligations to Purchaser, Seller shall execute a financing statement and any and all other instruments and documents that Purchaser may now or hereafter deem to be required or provided for by the UCC or other law applicable thereto reflecting the security interests granted to Purchaser under this Agreement. Seller hereby authorizes Purchaser to file a financing statement to reflect the security interest granted to Purchaser in this Agreement and to describe the foregoing collateral in any financing statement as "all personal property." Any term used in the UCC and not defined in this Agreement has the meaning given to that term in the UCC. Purchaser may hold all sums of money due to Seller by Purchaser (including, without limitation, any additional conditional consideration otherwise due to Seller) and any of Seller's money or property at any time in Purchaser's possession as security for any and all Obligations now or hereafter owing to Purchaser by Seller, whether arising hereunder, independently hereof, or acquired by Purchaser by assignment or otherwise, notwithstanding that any of that money or property might have been deposited, pledged, or delivered by Seller, or any other entity for any other, different, or specific purpose. Without in any way limiting the generality of the foregoing rights, Seller specifically agrees that Purchaser may exercise a right of set-off against additional conditional consideration otherwise due Seller or against any checks or other funds due Seller that may come into Purchaser's possession (whether by purchase of an Account, by mistaken payment by Account Debtors, or otherwise), to pay liquidated damages Seller may owe pursuant to this Agreement.

10. **Authorizations to Purchaser.**
10.1. Seller irrevocably authorizes Purchaser at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release an account debtor or other obligor(including filing of any public record releasing any lien granted to Seller by such account debtor), without affecting any of the Obligations, (e) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable, (f) file in the name of Seller or Purchaser or both, (1) mechanics lien or related notices or (2) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty, and (g) notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser, and (h) communicate directly with Seller's Account Debtors to verify the amount and validity of an Account created by Seller.

10.2. Seller authorizes Purchaser at any time, and from time to time, to file any initial financing statements and amendments thereof that:

10.2.1. indicate the collateral as all assets of the Seller or words of similar effect, regardless of whether any particular asset comprised in the collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail.

10.2.2. contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Seller is an organization, the type of organization, and any

bel

Seller Initials _____          Purchaser Initials _____

organization identification number issued to Seller and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral, a sufficient description of real property to which the Collateral relates; and

10.2.3. contain a notification that Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be tortuously interfering with Purchaser's rights;

10.2.4. advises third parties that any notification of Seller's Account Debtors will interfere with Purchaser's collection rights.

10.3. Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

10.4. Seller hereby authorizes Purchaser to contact the Vendor that is being utilized to complete the Approved Purchase Order. Seller hereby authorizes Purchaser to make payments directly to Vendors on Seller's behalf, and agrees that all such payments shall be advances by Purchaser to Seller hereunder, and are repayable as provided herein.

10.5. Seller authorizes Purchaser to accept, endorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the Uniform Commercial Code, or otherwise.

10.6. Authorized Representatives. Seller hereby appoints Brian Levin with full power-of-attorney to act on Seller's behalf in regard to this Agreement and to take any and all actions required or permitted to be taken by Seller pursuant to this Agreement, and Purchaser is entitled to treat all of their actions as being authorized by Seller unless and until Purchaser receives written notification from Seller to the contrary.

11. **ACH Authorization**. In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller wherever located.

12. **Covenants By Seller.**

12.1. Seller shall not, without prior written consent of Purchaser in each instance (a) grant any extension of time for payment of any Purchased Account, (b) compromise or settle any Purchased Account for less than its Face Amount (c) release in whole or in part any Account Debtor, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Purchased Accounts.

12.2. From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

12.3. Seller shall maintain its books and records in accordance with Generally Accepted Accounting Principles ("GAAP") and shall provide to Purchaser: 1) its annual tax return (within 10 days of filing); 2) its internally prepared financial statements monthly (within 25 days of each month end); 3) its accounts receivable, accounts payable aging and inventory reports (in such form and with such detail as Purchaser shall require) monthly (within 25 days of each month end); 4) its annual budget for the subsequent year, with pro-forma monthly income statements and balance sheets (within 60 prior to fiscal year end); 5) the annual tax returns of the Guarantor (within 10 days of filing); 6) CPA reviewed financial statements, annually within 180 days of fiscal year end; 7) weekly collateral reporting of the Seller's Accounts, Inventory and Purchase Orders(in such form and with such detail as Purchaser shall require); 8 the personal financial statements of the Guarantor on an annual basis not later than June 1st of each year; and 9) upon Purchaser's request, any other financial information including, but not limited to financial statements, accounts receivable and accounts payable details, tax returns of any kind, cash receipts records, and bank statements. Seller shall complete IRS form 8821 authorizing the IRS to notify Purchaser on certain tax matters. Purchaser shall have the right to audit and inspect any and all accounting records at the Sellers premises upon demand.

12.4. At Purchaser's sole discretion, Seller may be required to have collateral audits conducted by a third-party examiner selected by Purchaser, the cost of which will be the responsibility of the Seller; provided, however, that prior to the occurrence of an Event of

Seller Initials ___ bel ___          Purchaser Initials _____

Default, the Seller shall only be responsible for the cost of no more than two (2) exams per year at a cost not to exceed $7,500.00. per exam. Upon and after the occurrence of an Event of Default, there shall be no limit on the cost or frequency of the exams to be paid for by the Seller.

12.5. An appropriate Authorized Representative of Seller shall provide to Purchaser an Affidavit of Compliance (similar in form to Exhibit D) by the 5th business day of each month.

12.6. Before sending any Invoice to an Account Debtor, Seller shall mark same with a notice of assignment as may be required by Purchaser.

12.7. All present and future shareholder and investor debt shall be subordinated to Purchaser, in form and content acceptable to Purchaser.

12.8. Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

12.9. Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee, Seller shall deliver in kind to Purchaser on the next banking day following the date of receipt by Seller, the amount of any payment of a Purchased Account. Any such payments collected by Seller are the property of Purchaser and are to be held in trust by Seller until remitted to Purchase.

12.10.    Seller shall immediately notify Purchaser if any of Seller's suppliers seek to impose a claim or trust against the Seller under the Packers and Stockyards Act ("PASA").

13. **Account Disputes**.  Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense.  Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense.  Upon the occurrence of an Event of Default Purchaser may resolve such issues with respect to any Account of Seller.

14. **Representations and Warranties**.  Seller represents and warrants that:

14.1.    It is fully authorized to enter into this Agreement and to perform hereunder;

14.2.    This Agreement constitutes its legal, valid and binding obligation; and

14.3.    Seller is solvent and in good standing in the State of its organization.

14.4.    The Purchased Accounts are and will remain:

13.4.1.1  bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business;

13.4.1.2  unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation;

13.4.1.3  not sales to any entity which is affiliated with Seller or in any way not an "arm's length" transaction;

14.5.    Seller has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased Accounts.

14.6.    Seller shall develop sufficient credit data to permit Purchaser to evaluate effectively prospective Accounts Receivable on a timely basis, and to take all steps reasonably required from time to time to facilitate the collection, for the benefit of Purchaser, of unpaid Invoices and will not in any way interfere with any right of Purchaser under this agreement with respect to Purchaser's collection of any Accounts or otherwise.

14.7.    Seller shall not adjust, settle, or extend the payment period for any Accounts Receivable without the express written permission of Purchaser.

14.8.    Seller shall promptly forward to Purchaser:  (a) copies of every summons, subpoena, process or notice or order for appearance in any suit or proceeding in which Purchaser may be involved and to cooperate with Purchaser's attorneys and insurance carriers in the defense of the same; and (b) notice of assessment or levy by any governmental authority in respect of taxes, workers compensation, or otherwise, and copies of all tax returns filed in respect of any of the foregoing.

14.9.    Seller shall not change its name, identity, corporate structure, or physical address, nor use any trade names, without giving Purchaser thirty (30) days prior written notice thereof.

bel

Seller Initials _____                    Purchaser Initials _____

14.10.   Seller's current owners shall not, directly or indirectly, become owners or operators of any other business enterprise or entity, except with Purchaser's written consent.

14.11.   No Account Receivable submitted to Purchaser shall be (a) from an entity which is affiliated, owned, or controlled, or under the dominion of, in any way whatsoever, directly or indirectly, of Seller, its owners, stockholders, officers or employees; (b) by its terms direct payment to any employee of Seller; or (c) be for products or services, which have not yet been delivered or rendered to the Account Debtor(s) (commonly referred to as "Prebilled Accounts").

14.12.   Seller shall maintain insurance covering Seller's business and/ or property in such amounts as shall be reasonably satisfactory to Purchaser; and, at the request of Purchaser, name Purchaser as loss payee of such insurance and provide appropriate documentation thereof.

14.13.   Seller shall not sell, transfer, pledge, grant a security interest in, factor, or convey any of its assets or enter into any agreement or understanding to do the same.

14.14.   Seller shall not incur any loans, factor any accounts, enter into any merchant cash agreement, or otherwise become indebted to third parties without the prior written consent of Purchaser.

14.15.   Seller is not aware of any claims against Seller by any of its suppliers under PASA.

15.   **Sole Funding Source.** Seller hereby agrees to use Purchaser as its sole and exclusive factoring and funding source. During the term of this Agreement and so long as any Obligations remain outstanding, Seller will not obtain factoring or financing for Accounts or any other form of financing, including without limitation, merchant cash advances, from other any other source, nor shall any person or business entity affiliated with Seller or any current or future owner of Seller, obtain such factoring or financing.

16.   **Default.**

16.1.   **Events of Default.** The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any Guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any Guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatsoever, (d) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment for performance of the Obligations, (e) any claims in excess of $10,000.00 are brought against Seller by any of its vendors, whether under PASA or otherwise.

16.2.   **Waiver of Notice.** Seller waives any requirement that Purchaser inform Seller by affirmative act or otherwise or any acceleration of Seller's Obligations hereunder. Further, Purchaser's failure to charge or accrue fees or charges at any "Default" or "Past Due" rate shall not be deemed a waiver by Purchaser of its claim thereto.

16.3.   **Effect of Default.**

16.3.1.   Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice.

16.3.2.   The Late Charge shall accrue and is payable on demand on any Obligation not paid when due.

17.   **Waiver.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

18.   **Effective Date; Termination.** This Agreement will be effective on the date it is signed by the Parties and shall be for a period of twenty-four (24) months. Purchaser may terminate this Agreement at its sole discretion with written notice to the Seller. Upon termination, Seller shall pay the Obligations to Purchaser, and Purchaser shall not Purchase Accounts from Seller.

19.   **Amendment.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

bel

Page 10 of 22            Seller Initials _____            Purchaser Initials _____

20. **No Lien Termination without Release**. In recognition of Purchaser's right to have its attorney's fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until all Obligations have been paid in full as described in this Agreement and Seller and Guarantor shall have executed and delivered to Purchaser a general release in form acceptable to the Purchaser. Seller understands that this provision constitutes a waiver of its rights under Section 9-513 of the UCC.

21. **Conflict**. Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

22. **Survival**. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

23. **Severability**. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

24. **Enforcement**. This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly.

25. **Relationship of Parties**. The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and Purchaser shall not be a fiduciary of the Seller, although Seller may be a fiduciary of the Purchaser.

26. **Attorney's Fees**. Seller agrees to reimburse Purchaser on demand for:

    26.1. the actual amount of all costs and expenses, including attorney's fees, which Purchaser has incurred or may incur in:

        26.1.1. negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof;

        26.1.2. any way arising out of this Agreement;

        26.1.3. protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought.

        26.1.4. the actual costs, travel, and attorney's fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party;

        26.1.4. the actual amount of all costs and expenses, including attorney's fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Seller's plan thereunder.

27. **Entire Agreement**. This Agreement supersedes all other agreements and understandings between the parties hereto, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

28. **Choice of Law**. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Florida, United States.

29. **Jury Trial Waiver**. **IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALING OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAVED; AND EACH ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

30. **Venue; Jurisdiction.** The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Purchaser so elects, be instituted in any court sitting in the State of Florida (the

Seller Initials _____  bel  Purchaser Initials _____

"Acceptable Forums"). Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Florida or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

31. **Assignment**. Purchaser may assign its rights and delegate its duties hereunder. Seller under no circumstance shall assign or pledge its rights and delegate its duties hereunder.

32. **Notice.** All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means to a receiver under the control of such party, or (iii) actual receipt by such party or an employee or agent of such party. All notices to Purchaser shall be deemed given upon actual receipt by a responsible officer of Purchaser. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

> **SELLER – PERKY JERKY, LLC**
>
> | | |
> |---|---|
> | Address: | 4380 South Syracuse Street, Suite 300 |
> | | Denver, CO 80237 |
> | | Brian Levin |
> | Officer Name / Title: | CEO |
> | Phone/ Fax Number: | 7203897171 |
> | Email Address: | brian@perkyjerky.com |
>
> **PURCHASER – Aegis Business Credit, LLC**
>
> | | |
> |---|---|
> | Address: | 3401 West Cypress Street, Suite 201 |
> | | Tampa, FL 33607 |
> | | Michael Fussell, President |
> | Phone / Fax: | 813-437-2511 / 813-341-3651 |
> | E-mail Address: | mfussell@aegisbusinesscredit.com |

33. **Validity Guaranty**. Purchaser has entered into this Agreement, in which the Purchaser has placed and will continue to place significant reliance upon direct communication or other transmission of information from the following Guarantors: _____. Each Guarantor, as individuals, jointly and severally guarantee that information provided to Purchaser in the normal course of business in relation to the terms of the Agreement, including, but not limited to, accounts for purchase, notification of changes to Purchased Accounts, receipt of Misdirected Payments and other representations regarding Seller, is valid, correct and true, to the best of their knowledge. Guarantors shall be held liable for knowingly transmitting information that is found to be incorrect or untrue.

34. **Counterparts**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

35. **Exposed Payments.**

35.1. Upon termination of this Agreement Seller shall pay to Purchaser (or Purchaser may retain), to hold in a non-segregated non-interest bearing account the amount of all Exposed Payments (the "Preference Reserve"), or shall, at the election of Purchaser, provide an indemnification in form and substance and from such party acceptable to Purchaser.

35.2. Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays to the bankruptcy or insolvency estate of the Account Debtor that made the Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code or other applicable state or federal law.

35.3. Purchaser shall refund to Seller from time to time that balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code, or other applicable state or federal law can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy or insolvency estate of the Account Debtor or otherwise.

34.4 During the term of this Agreement, Seller shall immediately pay to Purchaser, upon demand of Purchaser, the amount of any Exposed Payments that Purchaser pays to the bankruptcy or insolvency estate of the Account Debtor that made the Exposed Payment,

on account of a claim asserted under Section 547 of the Bankruptcy Code, or other applicable state or federal law, including, without limitation, all attorney's fees and expenses of Purchaser's counsel in connection with such Exposed Payment.

Seller Initials `bel` _____          Purchaser Initials _____

IN WITNESS WHEREOF, the Parties hereto, heretofore duly authorize, have executed this Agreement as of the date first set forth above.

SELLER:

**PERKY JERKY, LLC**

By: _____

Name:  Brian Levin

Title: CEO


STATE OF COLORADO
COUNTY OF DENVER

      The foregoing instrument was acknowledged before me this _____ day of April, 2020, by Brian Levin, who is either *[CHECK WHERE APPLICABLE]* _ personally known to me, or __ has produced a _____ driver's license as identification.

|  |  |
|---|---|
| (Notarial Seal) | Print Name:_____<br>NOTARY PUBLIC<br>My Commission Expires:_____ |


PURCHASER:

**Aegis Business Credit, LLC**

By: _____
Name: Michael Fussell
Title: President


STATE OF _____
COUNTY OF _____
      The foregoing instrument was acknowledged before me this _____ day of April, 2020, by Michael Fussell, who is either *[CHECK WHERE APPLICABLE]* __ personally known to me, or __ has produced a _____ driver's license as identification.

|  |  |
|---|---|
| (Notarial Seal) | Print Name:_____<br>NOTARY PUBLIC<br>My Commission Expires:_____ |


**Guarantor(s)**
Brian Levin
Signed: _____
Home Address

_____
_____

SS#_____

Seller Initials ___BEL___        Purchaser Initials _____

STATE OF <u>COLORADO</u>
COUNTY OF <u>ARAPAHOE</u>

    The foregoing instrument was acknowledged before me this _____ day of April, 2020, by_____who is either *[CHECK WHERE APPLICABLE]* ___ personally known to me, or ___ has produced a _____ driver's license as identification.

Print Name:_____
NOTARY PUBLIC
My Commission Expires:_____

(Notarial Seal)

Seller Initials _____   bel   Purchaser Initials _____

**EXHIBIT A**

<u>Schedule of Accounts</u>

**Aegis Business Credit, LLC**

| Customer | Invoice# | Ref Period:  Date | Invoice Amt. |
|---|---|---|---|
| 1. _____ | _____ | _____/_____ | $_____ |
| 2. _____ | _____ | _____/_____ | _____ |
| 3. _____ | _____ | _____/_____ | _____ |
| 4. _____ | _____ | _____/_____ | _____ |
| | | | ----------------------- |
| Total: | | | $    _____ |

*The undersigned hereby presents for sale to Aegis Business Credit, LLC the Accounts list above in accordance with that certain Factoring and Security Agreement between the undersigned and Aegis Business Credit, LLC.   I hereby attest that all the Accounts presented herein are for services and / or goods delivered by Seller and represent bona fide accounts due from the Account Debtors.*

Sellers Name:  _____

Signature:  _____

Title:  _____

Date:  _____

Page 16 of 22          Seller Initials  bel          Purchaser Initials  _____

**\*If additional pages are needed please attached and signed the bottom of each page**

**EXHIBIT A-1**

<u>Schedule of Purchase Orders</u>

Seller Initials ___bel___     Purchaser Initials _____

**EXHIBIT B**

Sample Notification Letter
NEEDS TO BE ON SELLER'S LETTERHEAD

Date

Name
Address

Dear _____:

We are pleased to advise that in order to better serve our customers, we have assigned our present and future accounts receivable due from Perky Jerky, LLC to Aegis Business Credit, LLC ("Aegis"), which provides accounts receivable financing to (SELLER).  In connection with such services, SELLER has advised Aegis that it has the right, without notice or consent, to assign, and has assigned its present and future accounts receivable due from your company to Aegis.  To the extent that you are now indebted or may in the future become indebted to (Seller) on an account, payment thereof must be made to Aegis Business Credit and not to (Seller) or any other entity.  Each such payment from you constitutes your confirmation to Aegis Business Credit (i) of the amount owed under such account and (ii) that there are no offsets or defenses to payment of such account.  Payment in any other way will not discharge this obligation.  The payments should be made to Aegis Business Credit and mailed to the following address:

## Aegis Business Credit, LLC
## PO Box 628274
## Orlando, FL 32862-8274

***This letter may only be revoked in writing and signed by an officer of Aegis Business Credit, LLC.***

| | |
|---|---|
| Agreed to By: | Acknowledged and Accepted By: |
| Seller Name | Account Debtor Name |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

**EXHIBIT C**

Verification Letter

Aegis Business Credit, LLC                              VIA FACSIMILE: 813.341.3651
3401 West Cypress Street, Suite 201
Tampa, FL 33607

Please be advised that the following invoices from _____ to

_____ ("Account Debtor") are for goods & services that has been satisfactorily completed and

approved for payment in full (less any retainage) within _____ days of the invoice date by the appropriate officers of Account Debtor without right of

offset or recoupment.

| Invoice # | Invoice Date | Invoice Amount | Deductions / Retainage | Amount Approved |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

The invoices above remain due and payable as of this date.

**Authorized By:**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

Seller Initials _____   bel   Purchaser Initials _____

**EXHIBIT C-1**

Verification Letter

Seller Initials bel _____          Purchaser Initials _____

**EXHIBIT D**

**AFFIDAVIT OF COMPLIANCE**

1.   Pursuant to that certain PURCHASE ORDER/ FACTORING AND SECURITY AGREEMENT dated April ____, 2020 (the "Agreement") between Perky Jerky, LLC ("Seller") and Aegis Business Credit, LLC ("Purchaser"), Seller has agreed to sell and assign to Purchaser, and Purchaser has agreed to purchase, the Seller's accounts, contractual rights, and rights to receive payment (collectively "Invoices") from certain Customers ("Account Debtors").

2.   As of the date of this Affidavit, the Affiant *to the best of his knowledge and belief* reaffirms the representations, warranties and covenants set forth in the Agreement, and that Seller is in full compliance with all terms and conditions of the Agreement, including without limitation, those items identified below.

3.   Without limiting the foregoing, as of the date of this Affidavit, with respect to **each Invoice** assigned to Purchaser under the Agreement:

**(Please fully describe exceptions in an attachment or indicate "none" where applicable)**

*A.*   Seller has indicated on each Invoice that payment should be made directly to Purchaser, *except*:

*B.*   Seller has forwarded or paid in-kind to Purchaser, within 5 business days of receipt, all monies received and/or collected by Seller from any source related to Invoices, *except*:

*C.*   All work and services within each Invoice was fully completed, eligible for reimbursement, *except*:

*D.*   The Seller has paid all payroll taxes, income taxes and other taxes and has filed all required returns when due, *except*:

*E.*   The Seller has made all payments to subcontractors and vendors associated with invoices submitted for purchase by Purchaser and that invoice and Seller is free of all liens, except for _____, and is requesting that the following amounts be wired to the following subcontractor and vendor to be in compliance with this agreement; _____.

*F.*   Seller has not received any notice from Account Debtor that any Invoice will not be paid in full, *except*:

*G.*   The Seller is not subject in any litigation and we are not aware of any pending or threatened litigation against us, *except*:

*H.*   There have been no material adverse change in the Seller's financial condition or any significant adverse event that may adversely affect the collectability of Invoices that Purchaser would reasonably want to know, *except*:

4.   This Affidavit is made for the purpose of inducing Purchaser to factor additional Invoices from Seller pursuant to the Agreement.

5.   Affiant is a duly authorized officer of Seller and is competent to provide this Affidavit. Affiant has personal knowledge of the facts contained herein and is authorized by the Seller to make the averments set forth in this Affidavit.

FURTHER AFFIANT SAYETH NAUGHT

_____          _____          _____
(Signature of Affiant)                                       Title                                                                Date

_____
Printed Name

bel

# Signature Certificate



Document Reference:   UAGLVMJSG2K5VG2MAPJRKD



Brian Levin
Party ID: ANH3B4IYJKZCFAXH4AUIXY
IP Address: 73.153.217.255

VERIFIED EMAIL   brian@perkyjerky.com



Multi-Factor
Digital Fingerprint Checksum

0103f8d2ac35ef9e251d87e8c9141d6e8611f6b6



**Timestamp**

2020-04-27 07:28:33 -0700

2020-04-27 07:28:32 -0700

2020-04-27 07:24:11 -0700

2020-04-27 07:22:33 -0700

**Audit**

All parties have signed document. Signed copies sent to: Suzanne Goodspeed,
Nick Rudden, Dawn Jones, and Brian Levin.

Document signed by Brian Levin (brian@perkyjerky.com) with drawn signature. -
73.153.217.255

Document viewed by Brian Levin (brian@perkyjerky.com). - 73.153.217.255

Document created by Dawn Jones (djones@goodspeedmerrill.com). - 76.25.117.66



This signature page provides a record of the online
activity executing this contract.

**Page 1 of 1**

## ASSIGNMENT AND CONSENT AGREEMENT

This **ASSIGNMENT AND CONSENT AGREEMENT** (this "Agreement"), is entered into on December 11, 2020 among AEGIS BUSINESS CREDIT, LLC, a Florida limited liability company ("Assignor"), Brian Levin (the "Guarantor"), Perky Jerky, LLC, a Delaware limited liability company ("Debtor") and HOWARD INVESTMENT HOLDINGS, LLC a Utah limited liability company ("Assignee").

## RECITALS

A. Assignor and Obligors are parties to the Documents pursuant to which the Assignor has extended credit to Debtor secured by certain assets of the Debtor.

B. Assignor has agreed to sell and assign all of its right, title and interest in and to the Documents and the rights and obligations evidenced therein as of the date hereof (the "Obligation") to Assignee in consideration of the payment of the balance due thereunder from Debtor to Assignor.

C. The unpaid balance of the Obligation is $492,937.36 as of December 11, 2020.

D. The Obligors consent to the Agreement.

**NOW THEREFORE**, in consideration of the premises, and intending to be legally bound hereby, the Parties agree as follows:

## 1. CERTAIN DEFINITION AND INDEX TO DEFINITIONS.

1.1 **Definitions.** The following terms shall have the meanings set forth below. Any capitalized terms not herein defined shall have the meaning proscribed in the Uniform Commercial Code.

1.1.1 **"Assigned Property"** - All Assignor's right, title and interest in and to the Documents, the Obligation and all collateral and guarantees relating thereto.

1.1.2 **"Assignee"** - See Preamble.

1.1.3 **"Assignor"** – See Preamble.

1.1.4 RESERVED

1.1.5 **"Documents"** – The documents executed in connection with the Obligation, as set forth in Exhibit 1.1.4.

1.1.6 **"Guarantor"** - See Preamble.

1.1.7 **"Obligation"** – See Recital B.

1.1.8 **"Obligors"** – The Debtor and the Guarantor.

1.1.9 **"Parties"** – Assignor, Debtor, Guarantors and Assignee.

1.1.10 **"Purchase Price"** – The Obligation.

1.1.11 **"UCC Filings"** - the forms UCC-1 listed on Exhibit 1.1.111.

1.1.12 **"Wire Instructions"** –

> Bank: First Utah Bank_
>
> ABA Routing Number: 124302613
>
> Account Number: 61023586
>
> Account Name: Howard Investment Holdings, LLC

Further Lock Box Info (for paper transfers):

**Howard Investment Holdings, LLC**

**PO Box 9202)**

**3350 S 2940 E**

**Salt Lake City, Utah 84109-9998**

2. <u>ASSIGNMENT.</u>

 2.1 In consideration of the payment of the Purchase Price, Assignor hereby assigns the Assigned Property to Assignee.

3. <u>WITHOUT RECOURSE ASSIGNMENT; COVENANTS, REPRESENTATIONS AND WARRANTIES.</u>

 3.1 The Assigned Property is assigned free and clear of any claims of any person or entity.

 3.2 This Assignment is without recourse (except as set forth below) and without warranties or representations, expressed or implied, except that Assignor warrants and represents that (and Assignee will have recourse against Assignor in the event that it suffers a loss as a result of the following representations and warrantees not being true, with Assignor's maximum liability not to exceed the Purchase Price):

 3.2.1 It is the owner of the Obligation;

2

3.2.2 Exhibit 1.1.4 represents a complete list of documents which evidence the Obligation, the security interest or affect Assignor's rights thereto, as well as Assignor's claims against Guarantor(s) and other third parties obligated thereon.

3.2.3 The balance of the Obligation set forth herein is correct to the best of Assignor's knowledge.

3.2.4 Upon consummation of this assignment, the Obligor will not be indebted to the Assignor.  If any such indebtedness shall arise in the future, the Assignor will not assert, vis-a-vis the Assignee or the Obligor, that such indebtedness is secured by the collateral described in the Documents.

3.3 The Assignor agrees to promptly, for a period of 180 days from the date hereof (the "Remittance Period"):

3.3.1 Pay to the Assignee, the proceeds of any of the Debtor's accounts receivable and all other funds of the Debtor received by Assignor on account of the Obligation subsequent to the date hereof.  The payments will be made by wire transfer, in accordance with the Wire Instructions, with the cost thereof to be borne by Assignee.

3.3.2 Send to Assignee, via email or overnight mail (at Assignee's expense) all remittance advices supporting or explaining the payments described in Section 3.3.1.

3.3.3 For all remittances made to Assignee by Assignor after 120 days from the date hereof, Assignor may also deduct a $50 processing fee per remittance, in addition to the other fees provided for above.  After the Remittance Period, Assignor will return any payments received to the remitter.

3

## 4. INDEMNIFICATION BY ASSIGNEE

In the event that any payment which is the subject of remittance by Assignor to Assignee pursuant to Section 3.3 or any payment that was received by Assignor and credited to the Debtor prior to the date hereof is returned unpaid for any reason or sought to be recovered by the payer or a representative thereof (including a trustee in bankruptcy) or assignee for the benefit of creditors on the grounds of preference, then Assignor shall promptly so advise Assignee in writing. Following the aforementioned written notice, Assignee shall have the exclusive right and obligation, at its sole cost and expense, to contest, defend or settle such claim. Assignee hereby indemnifies and holds Assignor harmless from and against any and all loss or expense arising out of the assertion of such claim including Assignor's reasonable attorneys' fees incurred (including those incurred by Assignor at all trial and appellate levels) arising out of or relating to any such claim or cause of action. Assignor shall not seek the above indemnification from Assignee so long as Assignee contests, defends and/or settles all such claims, and as a result Assignor has no liability for any of the above described matters. This indemnification shall be irrevocable.

## 5. COVENANTS BY OBLIGORS.

5.1 Upon execution of this assignment, the Obligation will be owed by the Obligors to the Assignee without setoff, defense counterclaim or recoupment, notwithstanding any claims which they may have against the Assignor.

5.2 Obligors consent to this Assignment and agree that all duties heretofore owed by them to the Assignor will hereafter be owed to the Assignee. Accordingly, Assignor will no longer be the secured party with respect to the UCC Filings.

5.3 Obligors release Assignor, its officers and directors and affiliates, from all claims howsoever arising, known and unknown, which it may now have against Assignor, including but not limited to claims arising under the Documents.

5.4 Obligors understand that this Agreement constitutes a waiver of significant rights that they may have and such waiver is being made as an inducement to Assignee to accept this assignment.

## 6. AMENDMENT

6.1 Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by the Parties. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

## 7. NOTICE.

7.1 All notices shall be effective upon: (a) the sending of an email to one of the email addresses below or (b) delivery to a recognized overnight delivery service of a properly addressed notice, delivery prepaid, with instructions to make delivery on the next business day. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

### Assignor

| | |
|---|---|
| Address | 3401 West Cypress Street, Suite 201 |
| | Tampa, FL 33607 |
| Attention: | Michael Fussell, President |
| Email: | mfussell@aegisbusinesscredit.com |

### Debtor

| | |
|---|---|
| Address | 4380 South Syracuse Street |
| | Suite 300 |
| | Denver, CO 80237 |
| Attention: | Brian Levin |
| Email: | brian@perkyjerky.com |

### Guarantor

| | |
|---|---|
| Address | 4380 South Syracuse Street |
| | Suite 300 |
| | Denver, CO 80237 |
| Email: | brian@perkyjerky.com |

### Assignee

| | |
|---|---|
| Address | 198 Woodhill Lane |
| | North Salt Lake, Utah 84054 |
| Attention: | Kevin Howard |
| Email: | kevin10@kahlawoffice.com |

## 8. ENFORCEMENT.

8.1 In the event that any Party finds it necessary to retain counsel in connection with the interpretation, defense, or enforcement of this agreement, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing Party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

5

## 9. CHOICE OF LAW.

9.1   This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Delaware.

## 10. INTERPRETATION.

10.1   This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly.

## 11. CONFLICTS WITH OTHER AGREEMENTS.

11.1   Unless otherwise expressly stated in any other agreement between the Parties, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

## 12. COUNTERPARTS.

12.1   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument.  Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

## 13. ENTIRE AGREEMENT.

13.1   This Agreement supersedes all other agreements and understandings between the Parties, verbal or written, express or implied, relating to the subject matter hereof.  No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement.  No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

IN WITNESS WHEREOF the Parties have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Assignor:

AEGIS BUSINESS CREDIT, LLC, a Florida limited liability company

By: _____
Name: Michael Fussell
Title: President

Debtor:

Perky Jerky, LLC, a Delaware limited liability company

By: _____
Name: Brian Levin
Title: CEO

Guarantor

_____
Brian Levin, individually

Assignee:

Howard Investment Holdings, LLC, a Utah Limited Liability Company

By: _____
Name: Kevin Howard
Title: CEO/Managing Partner

7

## EXHIBIT 1.1.4

1.      Purchase Order/Factoring and Security Agreement dated as of April 24, 2020, as may have been amended and/or restated from time to time

2.      Intellectual Property Security Agreement dated as of April 27, 2020, as filed on Reel 052509/0562 with the USPTO

3.      Indemnification from Brian Levin

**EXHIBIT 1.1.111**

UCC Filing Number 2020 2907824 by Assignor against the Debtor, filed April 23, 2020

9

**EXHIBIT 2**
**(Budget)**

# Perky Jerky - Operating Budget (CASH)

| | Week 1 Cash In (Out) | Week 2 Cash In (Out) | Week 3 Cash In (Out) | Week 4 Cash In (Out) | Mth 2 Cash In (Out) | Mth 3 Cash In (Out) | Mth 4 Cash In (Out) | Mth 5 Cash In (Out) | Mth 6 Cash In (Out) |
|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance (lockbox and bank account)** | $245,000 | $248,000 | $263,000 | $277,000 | $229,050 | $283,750 | $318,450 | $453,150 | $437,850 |
| **Net Cash Received** | | | | | | | | | |
| **Cost Of Sales** | 20,000 | 20,000 | 20,000 | 50,000 | 300,000 | 200,000 | 300,000 | 100,000 | 50,000 |
| Tolling and ingredient charges for new production | ($12,000) | | | ($35,000) | ($175,000) | ($100,000) | ($100,000) | ($50,000) | ($50,000) |
| Marketing Platform/Licensing Fees | | | | | ($5,000) | | | | |
| Sales Broker Commissions | ($3,000) | ($3,000) | ($3,000) | ($3,000) | ($12,000) | ($12,000) | ($12,000) | ($12,000) | ($12,000) |
| **General & Administrative** | | | | | | | | | |
| Bank Service Charges | | | | ($500) | ($350) | ($350) | ($350) | ($350) | ($350) |
| **Compensation** | | | | | | | | | |
| Essential Employee Wages w/tax | | | | ($33,500) | ($23,500) | ($23,500) | ($23,500) | ($23,500) | ($23,500) |
| Employer Health Insurance w dental | | | | ($4,000) | ($3,500) | ($3,500) | ($3,500) | ($3,500) | ($3,500) |
| **Total - Compensation** | | | | | | | | | |
| Computer and Internet Expenses | ($1,000) | ($1,000) | ($2,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| Temps & Contractors | | | | ($3,000) | ($3,000) | ($3,000) | ($3,000) | ($3,000) | ($3,000) |
| Insurance Expense | | | | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| Office Supplies | | | | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) |
| Postage, Shipping, Delivery | | | | ($250) | ($250) | ($250) | ($250) | ($250) | ($250) |
| Business Consulting | | | | ($1,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| Accounting & Legal Fees | ($1,000) | ($1,000) | ($1,000) | ($2,000) | ($2,000) | ($2,000) | ($2,000) | ($2,000) | ($2,000) |
| Rent Expense | | | | ($4,200) | ($4,200) | ($4,200) | ($4,200) | ($4,200) | ($4,200) |
| Travel Expense | | | | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) |
| **NET CASH FLOW** | 3,000 | 15,000 | 14,000 | (47,950) | 54,700 | 34,700 | 134,700 | (15,300) | (65,300) |
| **Ending Cash Balance** | $248,000 | $263,000 | $277,000 | $229,050 | $283,750 | $318,450 | $453,150 | $437,850 | $372,550 |

**EXHIBIT C**

# Perky Jerky - Operating Budget (CASH)

| | Week 1 In | Week 1 (Out) | Week 2 In | Week 2 (Out) | Week 3 In | Week 3 (Out) | Week 4 In | Week 4 (Out) | Mth 2 In | Mth 2 (Out) | Mth 3 In | Mth 3 (Out) | Mth 4 In | Mth 4 (Out) | Mth 5 In | Mth 5 (Out) | Mth 6 In | Mth 6 (Out) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance (lockbox and bank account) | $245,000 | | $248,000 | | $263,000 | | $277,000 | | $229,050 | | $283,750 | | $318,450 | | $453,150 | | $437,850 | |
| Net Cash Received | 20,000 | | 20,000 | | 20,000 | | 50,000 | | 330,000 | | 200,000 | | 300,000 | | 100,000 | | 50,000 | |
| **Cost Of Sales** | | | | | | | | | | | | | | | | | | |
| Tolling and ingredient charges for new production | | | | | | | | ($35,000) | | ($175,000) | | ($100,000) | | ($100,000) | | ($50,000) | | ($50,000) |
| Marketing Platform/Licensing Fees | | ($12,000) | | | | | | | | | | | | | | | | |
| Sales Broker Commissions | | ($3,000) | | ($3,000) | | ($3,000) | | ($3,000) | | ($12,000) | | ($12,000) | | ($12,000) | | ($12,000) | | ($12,000) |
| **General & Administrative** | | | | | | | | | | | | | | | | | | |
| Bank Service Charges | | | | | | | | ($500) | | ($350) | | ($350) | | ($350) | | ($350) | | ($350) |
| **Compensation** | | | | | | | | | | | | | | | | | | |
| Essential Employee Wages w/tax | | | | | | | | ($33,500) | | ($23,500) | | ($23,500) | | ($23,500) | | ($23,500) | | ($23,500) |
| Employer Health Insurance w dental | | | | | | | | ($4,000) | | ($3,500) | | ($3,500) | | ($3,500) | | ($3,500) | | ($3,500) |
| Total - Compensation | | | | | | | | | | | | | | | | | | |
| Computer and Internet Expenses | | ($1,000) | | ($1,000) | | ($2,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) |
| Temps & Contractors | | | | | | | | ($3,000) | | ($3,000) | | ($3,000) | | ($3,000) | | ($3,000) | | ($3,000) |
| Insurance Expense | | | | | | | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) |
| Office Supplies | | | | | | | | ($500) | | ($500) | | ($500) | | ($500) | | ($500) | | ($500) |
| Postage, Shipping, Delivery | | | | | | | | ($250) | | ($250) | | ($250) | | ($250) | | ($250) | | ($250) |
| Business Consulting | | ($1,000) | | ($1,000) | | ($1,000) | | ($1,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) | | ($5,000) |
| Accounting & Legal Fees | | | | | | | | ($2,000) | | ($2,000) | | ($2,000) | | ($2,000) | | ($2,000) | | ($2,000) |
| Rent Expense | | | | | | | | ($4,200) | | ($4,200) | | ($4,200) | | ($4,200) | | ($4,200) | | ($4,200) |
| Travel Expense | | | | | | | | ($1,000) | | ($1,000) | | ($1,000) | | ($1,000) | | ($1,000) | | ($1,000) |
| **NET CASH FLOW** | 3,000 | | 15,000 | | 14,000 | | | (47,950) | 84,700 | | 34,700 | | 134,700 | | | (15,300) | | (65,300) |
| Ending Cash Balance | $248,000 | | $263,000 | | $277,000 | | $229,050 | | $283,750 | | $318,450 | | $453,150 | | $437,850 | | $372,550 | |